The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK RAHNER,

               Plaintiff,

     v.

THE SEATTLE TIMES COMPANY, a
Delaware corporation,

               Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 2:12-cv-00880-JCC

DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT ON ALL
CLAIMS

**NOTE ON MOTION
CALENDAR:  August 2, 2013**

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC)
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1

## <u>TABLE OF CONTENTS</u>

2

**Page**

3

I.   INTRODUCTION AND RELIEF REQUESTED ........................................................ 1

4

II.   STATEMENT OF UNDISPUTED FACTS .................................................................. 1

5

    A.   The Seattle Times. .............................................................................................. 1

6

    B.   Plaintiff's Employment with STC. ..................................................................... 3

7

    C.   Rahner is "Frustrated" With His Assignment as a GA Reporter and His

8

        Performance Declines............................................................................................ 4

9

    D.   Rahner Discloses his Chronic Fatigue Syndrome and STC Engages in the
        Interactive Process to Accommodate Rahner's Purported Disability. ................ 5

10

    E.   STC Decides to Move Rahner to Evenings. ....................................................... 6

11

    F.   Rahner Refused The Move to the Evening Shift, Took a Five Month

12

        Medical Leave, and Abandoned His Job. ........................................................... 8

13

        1.   Rahner Was Released to Return to Work After Exhausting

14

             FMLA, But Refused STC's Accommodations......................................... 8

15

        2.   Dr. Dompe Unequivocally States that Rahner Can Return to
             Work the Evening Shift. ........................................................................ 11

16

        3.   Rahner Abandons The Interactive Process and Never Returns to

17

             Work. ...................................................................................................... 12

18

    G.   Rahner's Agency Charge and EEOC Investigation............................................ 13

19

III.   AUTHORITY AND ARGUMENT .............................................................................. 13

20

    A.   Rahner's Failure to Accommodate Claim Fails. ................................................. 13

21

    B.   Rahner Was Not A Qualified Individual. ........................................................... 14

22

        1.   Predictable Attendance and Punctuality are Essential Job

23

             Functions. .............................................................................................. 14

24

        2.   Rahner is Not Qualified Since He Rejected STC's Reasonable
             Accommodations and Abandoned the Interactive Process. ................... 15

25

    C.   Rahner's Proposed Accommodation of a Discretionary Schedule is

26

        Unreasonable. ...................................................................................................... 17

27

---

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - i
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

D.     Rahner Did Not Suffer Any Adverse Employment Action Because of His
       Disability. ............................................................................................. 18

E.     Rahner Cannot Establish Disability Discrimination under ADA or
       WLAD. .................................................................................................. 19

       1.     Rahner cannot establish a prima facie case of disparate treatment. ....... 19

       2.     STC has legitimate business reasons for its decisions............................ 20

       3.     Rahner has no evidence showing that STC's reasons are
              pretextual. ............................................................................................. 20

F.     Rahner Cannot Establish Hostile Work Environment........................................ 21

G.     Rahner's Wrongful Discharge and Negligent Infliction of Emotional
       Distress Claims Are Duplicative And Must Be Dismissed. ............................... 22

IV.    CONCLUSION ............................................................................................. 23

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - ii
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Allen v. Pac. Bell*,
    348 F.3d 1113 (9th Cir. 2003) ............................................................................ 19

*Bates v. United Parcel Serv., Inc.*,
    511 F.3d 974 (9th Cir. 2007) .............................................................................. 14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 127 S. Ct. 1955 (2007) ............................................................... 22

*Bradley v. Harcourt, Brace & Co.*,
    104 F.3d 267 (9th Cir. 1996) .............................................................................. 20

*Brown v. City of Tucson*,
    336 F. 3d 1181 (9th Cir. 2003) ........................................................................... 21

*Carmona-Rivera v. Puerto Rico*,
    464 F.3d 14 (1st Cir. 2006) ................................................................................ 22

*Faragher v. City of Boca Raton*,
    524 U.S. 775, 118 S. Ct. 2275 (1998) ............................................................... 22

*Fonseca v. Sysco Food Servs. of Ariz., Inc.*,
    374 F.3d 840 (9th Cir. 2004) .............................................................................. 20

*Fox v. Gen. Motors Corp.*,
    247 F.3d 169 (4th Cir. 2001) .............................................................................. 21

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17, 114 S.Ct. 367 (1993) ..................................................................... 21

*Jones v. Rabanco, Ltd.*,
    439 F. Supp. 2d 1149 (W.D. Wash. 2006) (Pechman, J.) ................................. 23

*Keever v. City of Middleton*,
    145 F.3d 809 (6th Cir. 1998) .............................................................................. 16

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 93 S.Ct. 1817 (1973) ................................................................... 19

*McGregor v. Nat'l R.R. Passenger Corp.*,
    187 F.3d 1113 (9th Cir. 1999) ............................................................................ 18

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - iii
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

*Murphy v. BeavEx, Inc.*,
    544 F. Supp.2d 139 (D. Conn. 2008) .................................................................22

*Nelson v. Pima Cmty. College*,
    83 F.3d 1075 (9th Cir. 1996) .............................................................................13

*Nidds v. Schindler Elevator Corp.*,
    113 F.3d 912 (9th Cir. 1996) .............................................................................19

*Pickens v. Soo Line R.R. Co.*,
    264 F.3d 773 (8th Cir. 2001) .............................................................................18

*Plummer v. Western Int'l Hotels Co.*,
    656 F.2d 502 (9th Cir. 1981) .............................................................................13

*Queen v. Hard Rock Hotel & Casino*,
    2:11-CV-00279-RLH, 2011 WL 6753011 (D. Nev. Dec. 22, 2011) (unpublished) ..............22

*Samper v. Providence St. Vincent Med. Ctr.*,
    675 F.3d 1233 (9th Cir. 2012) ................................................................13, 14, 15

*Sharpe v. Am. Tel. & Tel. Co.*,
    66 F.3d 1045 (9th Cir. 1995) .............................................................................17

*Smith v. Midland Brake, Inc.*,
    180 F.3d 1154 (10th Cir. 1999) ..........................................................................18

*US Airways, Inc. v. Barnett*,
    535 U.S. 391, 122 S.Ct. 1516 (2002) ................................................................17

*Wilton v. Master Solutions, Inc.*,
    No. C12-66RSL, 2013 WL 1561927 (W.D.Wash., Apr. 12, 2013) ...........................23

*Zivkovic v. Southern California Edison Co.*,
    302 F.3d 1080 (9th Cir. 2002) .....................................................................17, 19

**State Cases**

*Adams v. Able Bldg. Supply, Inc.*,
    114 Wn. App. 291, 57 P.3d 280 (2002)..............................................................22

*Davis v. Microsoft Corp.*,
    149 Wn.2d 521, 70 P.3d 126 (2003) ..................................................................14

*Dean v. Metro. Seattle*,
    104 Wn.2d 627, 708 P.2d 393 (1985) ................................................................17

*Doe v. Boeing Co.*,
    121 Wn.2d 8, 846 P.2d 531 (1993) ....................................................................17

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - iv
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

*Domingo v. Boeing Employees' Credit Union*,
    124 Wn. App. 77, 98 P.3d 1222 (Div. 1 2004).................................................................19

*Francom v. Costco Wholesale Corp.*,
    98 Wn. App. 845, 991 P.2d 1182 (2000)....................................................................23

*Glasgow v. Georgia-Pac. Corp.*,
    103 Wn.2d 401, 693 P.2d 708 (1985) ........................................................................22

*Hegwine v. Longview Fibre Co., Inc.*,
    162 Wn.2d 340, 172 P.3d 688 (Wash.,2007) ...........................................................19

*Kirby v. City of Tacoma*,
    124 Wn. App. 454, 98 P.3d 827 (2004)....................................................................18

*Korslund v. DynCorp Tri-Cities Servs., Inc.*,
    156 Wn.2d 168, 125 P.3d 119 (2005) .......................................................................23

*Molloy v. City of Bellevue*,
    71 Wn. App. 382, 859 P.2d 613 (1993)....................................................................17

*Riehl v. Foodmaker, Inc.*,
    152 Wn.2d 138, 94 P.3d 930 (2004) ............................................................14, 17, 18

*Robel v. Roundup Corp*,
    148 Wn.2d 35, 59 P.3d 611 (2002) ..........................................................................21

*Snyder v. Medical Servs. Corp. of E. Wash.*,
    145 Wn.2d 233, 35 P.3d 1158 (2001) ......................................................................17

*Washburn v. Gymboree Retail Stores*, Inc., C11-822RSL, 2012 U.S. Dist. LEXIS 125378
    (W.D. Wash. Sept. 4, 2012).....................................................................................19

*Washington v. Boeing Co.*,
    105 Wn. App. 1, 19 P.3d 1041 (2000)......................................................................22

**Federal Statutes**

29 C.F.R. § 1630.2.........................................................................................................14

42 U.S.C. § 12111(8).................................................................................................14, 18

ADA ...........................................................................................................13, 19, 21

Title I of the Americans with Disabilities Act..................................................................17

FMLA ...................................................................................................................*passim*

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - v
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

**State Statutes**

Energy Reorganization Act ........................................................................................... 23

**Other Authorities**

*Kendall v. Ashcroft (DOJ)*, 2005 EEOPUB LEXIS 350 (EEOC 2005) ....................................... 18

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

1

## I.      INTRODUCTION AND RELIEF REQUESTED

Plaintiff Mark Rahner is a former General Assignment Reporter for Defendant The

Seattle Times Company ("STC").  He abandoned his job in January 2011 after unilaterally

severing the interactive process without attempting the reasonable accommodation STC provided

for his alleged chronic fatigue syndrome.  Rahner flatly refused STC's accommodation of his

condition, which his own doctor identified as the *only* accommodation that Rahner needed.  He

quit because he did not want to work the shift to which he was assigned - a position he thought

was "mundane" and underutilized his skills - and because STC would not provide him the

specific (and facially unreasonable) accommodation he preferred:  independence to come and go

as he pleased without adhering to a schedule and without notifying his supervisors of his

absences, whereabouts, or status.

Plaintiff's claims for failure to accommodate his CFS and disability discrimination

cannot succeed as a matter of law in light of STC's willingness to accommodate him, his

withdrawal from the interactive process, and his job abandonment.  His associated claims of

hostile work environment, wrongful discharge, and negligent infliction of emotional distress are

similarly unavailing.  Because no genuine issue of material fact exists regarding Rahner's claims,

STC respectfully requests that the Court grant summary judgment and dismiss Plaintiff's claims

with prejudice.

## II.      STATEMENT OF UNDISPUTED FACTS[1]

### A.      The Seattle Times.

Founded in 1896, *The Seattle Times* ("*The Times*") is a local, family-owned newspaper

with a Sunday circulation of nearly 350,000.  It is one of the last great regional papers in the U.S.

and has won nine Pulitzer Prizes.  Statement of Undisputed Facts ("Att. 1"), ¶¶ 1-2.

*The Times*' headquarters and newsroom are located in South Lake Union.  The newsroom

consists of four primary reporting departments: local news (also known as the "Metro desk"),

---

[1] This motion is based entirely on Plaintiff's own testimony and documents he cannot dispute.  See Statement of
Undisputed Facts and Key Admissions, Attachment 1 hereto.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 1
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

sports, features, and business and technology.  *Times* reporters work certain shifts in order to meet deadlines and ensure adequate and quality coverage.  The Metro desk follows three shifts: the early morning shift (starting at 7 a.m.), the day shift (9 a.m. to 6 p.m.), and the evening shift (3 p.m. to 11:30 p.m.).  Within Metro, individual reporters perform distinct functions and duties specific to their assignments.  For example, some reporters hold "enterprise" beats: they conceptualize and produce periodic reports on general topics or themes, such as the environment. Enterprise reporters generally do not respond to press releases or breaking news events. Instead, they primarily develop their own story ideas.  By contrast, other beats are essentially reactive, such as the "police beat" or the "courts beat."  Those reporters primarily cover daily news occurrences.  One such position is the general assignment beat that the Plaintiff was assigned to, which covers breaking news and fills coverage gaps.  That position produces daily stories for the print edition and often publishes intermittent updates on the *Times'* website.  While punctuality and attendance is important for all reporters, adhering to a strict schedule is especially important for such reporters because of the role they fill.  The news operation relies on those reporters for important work that cannot be postponed.  Therefore, if they fail to timely report to work, the desk has one less hand on deck and coverage suffers.  Att. 1, ¶¶ 3-14.

*The Times* has been shrinking due to the financial challenges facing newspapers over the last ten years.  Its workforce, including the editorial staff, has been reduced dramatically over the past five or six years.   The newsroom has laid off employees, left multiple positions open, and cut back on a host of expenses in an effort to reduce costs.  While STC has been adapting to this new environment for much of the last 10 years, 2008 was a particularly challenging year resulting in a sweeping restructuring of the newsroom departments.  STC downsized its Features desk, where Plaintiff had worked for eight years.  Since 2004, the Metro department has not added a single reporter (other than interns or residents).  The reporters who remain with the paper are forced to do more with less.  Many departments and beats have been eliminated, reshuffling experienced reporters into less coveted, but critical, newsroom roles. Att. 1, ¶¶ 15-22.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 2
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

**B.      Plaintiff's Employment with STC.**

STC hired Plaintiff Mark Rahner in 1999 as a freelance reporter.  The following year, STC hired him as a full-time reporter in the Features department.  For the next eight years, Rahner covered pop culture in Features.  He often wrote about concerts, comic books, comedy, restaurants, and entertainment-related events.  Rahner did not work set hours or a "formal shift" while covering pop culture given the nature of the events and topics he covered.  Rahner rarely covered breaking news and was primarily focused on long-form pop-culture stories with multi-week deadlines.  He generally worked without short-term or daily deadlines.  Att. 1, ¶¶ 23-29.

When STC reduced the Features department in 2008, STC moved Rahner to the Metro news department (a/k/a the "Metro desk") instead of terminating his employment.  Att. 1, ¶ 30. Rahner became a General Assignment ("GA") reporter.  Att. 1, ¶ 31.  Unlike his prior role as the pop-culture reporter, as a GA reporter, he was expected to cover breaking news and the "news of the day."  Att. 1, ¶ 32.  GA reporting is very different than pop-culture reporting.  Att. 1, ¶ 33. The role that Rahner was expected to fill was deadline-driven and often involved assignments for stories due the same day.  Att. 1, ¶ 34.  Editors assign stories to GA reporters that the editors believe should be included in the following day's paper (and printed online).  Att. 1, ¶ 35.  GA reporters are also expected to generate their own story ideas, and to pitch these ideas to their editors.  Att. 1, ¶ 36.  This is called "enterprise" reporting.  Some GA reporters focus all or nearly all of their efforts on enterprise reporting or are assigned to specific roles (e.g., producing stories for the "Pacific NW Magazine").  Att. 1, ¶ 37.  Others, like Rahner, are expected to do both breaking news on a daily basis and enterprise reporting.  Att. 1, ¶ 38.

As a GA reporter, Rahner was initially assigned to the day shift (approximately 9 a.m. – 6 p.m.).

> Q:      When you moved over to the Metro desk as a general assignment reporter, were you assigned to a shift?
>
> A:      Yeah, that was more rigid.  The shift technically was 9[am] to 5[pm] or 6[pm].

Att. 1, ¶ 39.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 3
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

### C.   Rahner is "Frustrated" With His Assignment as a GA Reporter and His Performance Declines.

When STC transferred Rahner to Metro in December 2008, Metro Editor Mark Higgins welcomed him to the department.  Att. 1, ¶ 40.  Metro had not hired a new reporter in years, and Rahner's editors hoped that he would provide much-needed support in the role.  *Id.*

Rahner was frustrated and disappointed with his transfer to the Metro Department.  Att. 1, ¶ 43.  Rahner's dislike of and disinterest in the GA reporting work was evident as soon as Rahner transferred to the Metro desk.  Att. 1, ¶ 44.  Instead of embracing his new role, he shunned its duties and tried to revert to the pop-culture beat he held for the Features department, a beat that the STC no longer considered a priority.  Att. 1, ¶ 45.  He considered being a GA reporter a "step down" from his pop-culture work and merely a "gopher" or "intern" position.  Att. 1, ¶ 46.  Rahner felt the position was not suited to what he believed to be his "demonstrated and widely praised work."  Att. 1, ¶ 47.  He criticized his editors for trying to put a "round peg in a square hole," and asserted that they "weren't very good at using the right tool for the job."  Att. 1, ¶ 48.

In light of Rahner's substandard performance, his editors had ongoing discussions with each other and with Rahner to establish expectations for him in the GA role.  Att. 1, ¶ 49.  These communications reaffirmed that Rahner was first and foremost a GA reporter (not a pop-culture writer) who needed to be available to report daily stories—most of which were assigned from editors.  Att. 1, ¶ 50.  In response to Rahner's frustrations and in an attempt to obtain good work product from Rahner, STC permitted Rahner to write stories and produce videos – which he starred in – beyond his GA role when time permitted.  Att. 1, ¶ 51.  However, STC made it clear these were intended to be side projects, not the main focus of his work.  Att. 1, ¶ 52.

As early as the fall 2009, STC began to consider and formally address Rahner's lack of performance, which appeared to stem in part from his disinterest in GA reporting.  Att. 1, ¶ 53.  In October 2009, Suki Dardarian, the Managing Editor of *The Times*, and Jim Simon, the Deputy Managing Editor, suggested Higgins start the performance review process with Rahner to

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 4
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

document and communicate concerns about role in the Metro department.  Att. 1, ¶ 54.

### D.    Rahner Discloses his Chronic Fatigue Syndrome and STC Engages in the Interactive Process to Accommodate Rahner's Purported Disability.

In late 2009 and early 2010, Rahner began showing up for work one or two hours late for his shift most days.  Att. 1, ¶ 55.  He did not notify his supervisors of his tardiness, whereabouts, or status.  *Id.*  On February 24, 2010, Higgins emailed Rahner about an assignment and asked him why he was coming in late and not keeping the same schedule as other reporters.  Att. 1, ¶ 57.  Rahner responded that he had "chronic fatigue" and it "requires flexibility."  *Id.*  Higgins almost immediately responded to offer Rahner intermittent FMLA, point him in the direction of accommodation resources, and to request from Rahner a doctor's note to begin the interactive process.  Att. 1, ¶ 59.  He explained that the doctor's note is required and needs to "explain what is happening and what you can and cannot do" in order to determine what accommodations STC can provide.  *Id.*  Approximately two weeks later, Rahner provided STC a note from his naturopath, Dr. Paul Dompe, N.D.  It stated: "Mark's condition requires that he get adequate rest, especially during the morning hours.  Please allow some flexibility in his schedule to meet his medical needs."  Att. 1, ¶ 61.  This was the first time Dr. Dompe diagnosed Rahner with chronic fatigue syndrome.  Att. 1, ¶ 62.

Given the vague and scant information in Dr. Dompe's note, STC asked Rahner to provide additional information from his doctor and again asked him to provide the necessary paperwork for an intermittent FMLA leave in the event he needed to take time off in the morning.  Att. 1, ¶ 63.  Rahner never filled out the FMLA paperwork for intermittent leave nor provided additional information from his doctor. [2]  Att. 1, ¶ 64.  For a month, STC was under the impression that Rahner was seeking certification from his health care provider for intermittent FMLA.  Att. 1, ¶ 68.  Meanwhile, Rahner continued to show up to work two hours late almost every day.  Att. 1, ¶ 69.

---

[2] In his deposition, Rahner for the first time stated that the reason he did not seek intermittent FMLA is that he believed it was "foolish" and "designed to simply embarrass me instead of deal with the problem."  He claimed that calling his editors on mornings when he would be late for his shift would be "totally unfeasible" and "a problem."  Att. 1, ¶ 66-67.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 5
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1    On April 16, 2010, Higgins met with Rahner.  Higgins raised the issue of Rahner's

2    consistently late arrivals. Att. 1, ¶ 70.  Higgins informed Rahner that, in a GA role, he needed to

3    be in the office each morning at 9 a.m. to receive assignments.  *Id*.  Higgins clarified that the

4    schedule independence Rahner enjoyed in Features was not an option in his role in the Metro

5    department.  *Id*.  Higgins told Rahner that if he needed to continue coming in one or two hours

6    late every day, he needed to seek intermittent FMLA and provide the requested information from

7    his doctor.  *Id*.  Rahner again ignored Higgins' request and continued to consistently report to

8    work two hours late for the next two months. Att. 1, ¶ 74.  Because of the ongoing efforts to sort

9    out Rahner's need for accommodation and leave, Rahner was not subject to disciplinary action

10   for his tardiness despite that it was violation of STC policies.  Att. 1, ¶ 75.

11       **E.    STC Decides to Move Rahner to Evenings.**

12       In June 2010, Higgins and Kraemer finally completed Rahner's performance evaluation,

13   a process that Higgins started in late 2009 before Rahner notified his managers of his alleged

14   CFS.  Att. 1, ¶ 76.  The evaluation addressed the serious performance concerns centering on

15   Rahner's inability to follow the basic tenants of working in a newsroom environment: Rahner

16   never embraced his role as a GA reporter;  he lacked follow-through on stories or opportunities;

17   he was not a proactive, self-directed member of the team; he was not collaborative and did not

18   want to follow the direction of his supervisors as demonstrated by the video project; his writing

19   tone was sometimes off key; and he continued to refuse to notify his supervisors when he would

20   be late.  *Id.*

21       Around the same time, in late May 2010, the STC was reshuffling positions within the

22   Metro department.  Att. 1, ¶ 79.  In reassigning beats and shifts, Higgins and the other editors

23   considered moving Rahner to the GA shift scheduled from 3 p.m. to 11:30 p.m.[3]  *Id*.  The job

24   description for the evening GA reporter is the same as the job description for the day GA

25   reporter, but the tasks and flow of the job are different.  Att. 1, ¶ 80.[4]  Whereas day GA reporters

26

27   _____
[3] The evening GA shift is interchangeably referred to as the "night shift" or "evening shift."
[4] The evening shift had the same pay, the same title and the same number of hours.  Att. 1, ¶ 81.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 6
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

report from the field, communicate with sources, and run down leads, the evening GA reporter largely works within the newsroom to update the day's top stories as they develop through the night and to monitor various sources for breaking news, including law enforcement announcements, news broadcasts and certain Twitter accounts.  Att. 1, ¶ 82.  Some days, there is downtime during which the evening shift reporter can work on enterprise stories or side projects. Att. 1, ¶ 83.  The evening GA reporter works with at least one editor who is available throughout the night to provide coverage and relief as needed.  Att. 1, ¶ 84.  The evening shift is typically less self-directed.  Att. 1, ¶ 85.  There are rote assignments that come up most or all shifts, and the rest of the work is usually assigned by an editor.  *Id.*  For both the day and evening shifts, punctuality is an essential function of the job.  Att. 1, ¶ 86.

The evening shift was open because the permanent evening GA reporter, a long-time STC reporter Charles Brown, was taking a long-term medical leave to treat terminal cancer and was not expected to return to work.  Att. 1, ¶ 87.  Previously, the paper had covered Brown's shorter-term medical leaves by temporarily rotating other reporters into the evening GA slot. Att. 1, ¶ 88.  That approach pulled reporters – often highly productive and successful reporters – off their beats for several days or weeks and dropped them into a position where they often had little or no knowledge of the daily routines.  Att. 1, ¶ 89.  Higgins determined that STC needed to fill the role on a permanent or semi-permanent basis to minimize the disruption and ensure quality coverage on evenings.  Att. 1, ¶ 90.

Higgins was short on options.  Att. 1, ¶ 91.  Rahner was an obvious candidate for the job. *Id.*  Rahner was not successful in the day GA role.  Att. 1, ¶ 92.  Rahner acknowledged this and his unhappiness in the role to his editors.  Att. 1, ¶ 93.  Rahner rarely generated his own stories, often declined or ignored opportunities to contribute, and was not as productive as expected.  Att. 1, ¶ 94.  Based on Rahner's poor track record with self-generated stories, STC wanted to transition him into a role where he would have tasks assigned to him and ready and waiting for him on a daily basis.  Att. 1, ¶ 95.  The evening shift fit this need.  *Id.*

Rahner's editors also believed the shift would help accommodate Rahner's CFS because

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 7
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1   he claimed to have difficulty reporting to work in the mornings and his failure to report to work

2   in the morning was not viable long term solution for the newsroom.  Att. 1, ¶ 96.  Rahner himself

3   admits that he suffered "extreme fatigue" in the mornings, and sought to not come in at that time

4   of day, which was not a long term viable solution.  Att. 1, ¶ 97.  Rahner reported to his doctor

5   that he is a "night owl," his "best writing is done at night," and his fatigue was not bad and he

6   had more energy in the evenings.  Att. 1, ¶ 98.

7          Moving Rahner to the evening shift met STC's business needs and appeared to meet

8   Rahner's medical needs.  Att. 1, ¶ 99.  In July 2010, Higgins and Kraemer met with Rahner to

9   deliver his performance review and told him that he would be starting the evening shift in

10  September 2010.[5]  Att. 1, ¶ 100.

11         **F.      Rahner Refused The Move to the Evening Shift, Took a Five Month Medical**
              **Leave, and Abandoned His Job.**

12         Rahner appeared upset that he was being moved to the evening shift.  Att. 1, ¶ 102.

13  Unable to acknowledge or recognize his own performance shortcomings, he believed it was a

14  great injustice to waste his talents on the evening shift.  Att. 1, ¶ 103.[6]  In response to Rahner's

15  resistance to the evening shift, Rahner's editors told him that they would consider his alternative

16  suggestions, but the only alternative he offered was a shift in which he could have complete

17  flexibility to come and go as he pleased.  Att. 1, ¶ 104.  Almost immediately after learning of the

18  schedule change, Rahner informed STC that he was going to take a continuous FMLA leave

19  although he made it clear he was not refusing his new assignment.  Att. 1, ¶ 105.  STC granted

20  Rahner's FMLA leave as requested by Rahner's naturopath, Dr. Dompe.  Att. 1, ¶ 106.

21         **1.      Rahner Was Released to Return to Work After Exhausting FMLA,**
                 **But Refused STC's Accommodations.**

22

23         Rahner exhausted his FMLA leave in late October 2010.  Att. 1, ¶ 108.  Dr. Dompe

24  released him to return to work with an accommodation of a "flexible work assignment that will

25  allow Mark *the periodic rest needed to prevent a relapse*."  Att. 1, ¶ 109.  The note emphasized

26  _____
    [5] STC told Mark that his stint as the evening GA reporter would last six months at which time they would evaluate
    how it was working and whether he would continue on nights or move back to days.  Att. 1, ¶ 101.
27  [6] Rahner had worked the evening shift a handful of times over the years, typically a weekend or covering one or two
    nights.  In one instance, he worked a two-week stint to cover an absence.  Att. 1, ¶ 107.

    DEFENDANT'S MOTION FOR SUMMARY JUDGMENT          Davis Wright Tremaine LLP
    (No. 2:12-cv-00880-JCC) - 8                          LAW OFFICES
    DWT 22154217v6 0040701-001034                         Suite 2200
                                                      1201 Third Avenue
                                                    Seattle, WA 98101-3045
                                              206.622.3150 main · 206.757.7700 fax

1    the need for Rahner to take rest breaks.  Att. 1, ¶ 110.  The note also stated:  "I do not

2    recommend night shift reporting as the demands of such an assignment will likely cause relapse

3    of Mark's condition."  *Id*.  Dr. Dompe testified that this last statement was based entirely on

4    Rahner's representation to him that the night shift required "hypervigilence" that would not

5    allow Rahner to take the necessary rest breaks.  Att. 1, ¶ 112.

6           In response to Dr. Dompe's letter, Sandra Hollenbeck, STC's Human Resources

7    Manager, called Rahner on November 3, 2010.  Att. 1, ¶ 113.  Rahner reiterated that mornings

8    were tough and stated that he did not wish to return to the evening shift.  *Id*.  Hollenbeck asked

9    Rahner if he had any alternatives to propose instead of the evening shift.  Rahner stated he

10   wanted independence of any scheduling; he insisted STC should not specify when he report to

11   work or take breaks and he could not adhere to a predictable schedule.  *Id*.  Hollenbeck extended

12   Rahner's leave to a non-FMLA medical leave pending the outcome of the interactive process and

13   additional information from Dr. Dompe.  Att. 1, ¶ 116.

14          Hollenbeck immediately sought clarification from Dr. Dompe.  Att. 1, ¶ 117.  Dr. Dompe

15   responded explaining that Rahner needed three 15-minute breaks per eight-hour shift, to be taken

16   as needed.  Att. 1, ¶ 118.  These breaks comported with Dompe's prior suggestion for "periodic

17   rest needed to prevent a relapse."  Att. 1, ¶ 119.  Dr. Dompe also stated there was "[n]o

18   restriction on [Rahner's] work hours," including "the time of day" for Rahner's shift.  Att. 1, ¶

19   120.  Asked about the basis for the statement in his October 27, 2010 letter that the evening shift

20   could lead to Rahner's relapse, Dr. Dompe responded that the evening shift "demands sustained

21   and continuous vigilance and does not allow the flexibility necessary to meet Mark's medical

22   needs (i.e. rest breaks at the onset of fatigue)."  *Id*.  Dr. Dompe's response to this question was

23   again based entirely on Rahner's report to him.  Att. 1, ¶ 122.

24          Based on that information from Dr. Dompe, STC determined that it could provide Rahner

25   the three 15-minute rest breaks to be taken as needed during an eight-hour shift.   Att. 1, ¶ 123.

26   Because Dompe appeared to be operating under a misimpression that STC could not provide

27   three 15-minute breaks during the evening shift (which it could and has been verified by the

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 9
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

current evening shift reporter, Alexa Vaughn), and because Dompe placed no restriction on work hours, STC confirmed Rahner's move to the evening shift. Att. 1, ¶ 124. Dr. Dompe testified that the three 15-minute rest breaks STC provided Rahner during his evening shift was the only accommodation he recommended:

> Q:    So in your view, in your medical opinion, if Mr. Rahner was able to take the three rest breaks on an as-needed basis throughout the shift, ***then there was no other accommodation he needed in order to allow him to maintain his health***?
>
> A:    I would add to that that what I think would benefit him most is to seek psychotherapy.
>
> Q:    But as far as the workplace is concerned?
>
> A:    ***Yeah, that's correct***.

Dompe Dep. 97:11-19 (emphasis added) (Declaration of Sheehan Sullivan Weiss in Support of Defendant's Motion for Summary Judgment (Sullivan Weiss Decl.), Ex. 2).

On November 26, 2010, Hollenbeck called Rahner to discuss his return to work on the evening shift in light of Dr. Dompe's answers to the questionnaire. Att. 1, ¶ 126. She told Rahner that STC could provide him three 15-minute rest breaks per eight-hour shift to be taken as needed. *Id*. Rahner refused this accommodation (and the evening shift) and stated that he wanted an assignment that allowed for full independence and flexibility. Att. 1, ¶ 128.

In December 2010, Rahner filed a grievance with his union regarding the decision to move him to the evening shift. Att. 1, ¶ 130. STC engaged in the grievance process to seek additional input from Rahner about his accommodation needs and to hopefully broker a mutually agreeable solution. Att. 1, ¶ 131. During the grievance process, Rahner again reiterated his demand for flexibility during a day shift and his union representative requested that STC create a new position that started at 11 a.m. *Id*. On December 17, 2010, Hollenbeck sent Rahner a letter responding that it would not create an 11 a.m. shift as it was not an effective use of the Metro department's limited resources, and informing him he needed to return to work at the evening shift. Att. 1, ¶ 133. The grievance process failed, and the union did not pursue the matter further. Att. 1, ¶ 134.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 10
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

At around the same time, Rahner complained to HR that he believed Higgins subjected him to a hostile work environment and that he assigned him to the evening shift as punishment. Att. 1, ¶ 135. STC's HR department investigated his complaint and did not find any evidence that Higgins or others managers in the newsroom treated Rahner in a hostile, unfair or discriminatory manner. Att. 1, ¶ 136.[7]

### 2. Dr. Dompe Unequivocally States that Rahner Can Return to Work the Evening Shift.

Following the grievance meeting, STC informed Rahner that he was expected to show up for work on January 3, 2011. Att. 1, ¶ 138. On the same day, Ms. Dardarian emailed the evening shift editors asking them to "Welcome [Rahner] back!," and to ensure that Rahner was provided his accommodations of three rest breaks per shift to be taken as needed. Att. 1, ¶ 139. Rahner did not show up for his scheduled shift on January 3, 2011. Att. 1, ¶ 140. Instead, he sent an email refusing to work the evening shift and suggesting that his blood work showed he was undergoing a "medical emergency" that would put him at further risk of relapse. *Id.*

Based on this new assertion of a medical emergency, STC again engaged in the interactive process and offered yet another medical leave. Att. 1, ¶ 141. STC followed up with Dr. Dompe on January 5, 2011 about Rahner's new assertions of a medical emergency and to seek clarification that Rahner could work the evening shift with the rest break accommodation in light of Rahner's continued insistence that STC has misinterpreted Dr. Dompe's prior notes. Att. 1, ¶ 142. The very next day, Dr. Dompe responded to STC's clarifying questionnaire. *Id.* In unequivocal terms, he stated that Rahner was not suffering from a medical emergency and that he was able to perform the night shift with the rest break accommodations offered by STC. *Id.* The following is an excerpt from Dr. Dompe's response:

> 2.     …Given that Mr. Rahner is able to take up to 3 15-minute
> rest breaks as needed during the 8-hour shift and based on
> my description of the duties of the position, is Mr. Rahner
> medically able to work the 3:00 to 11:30 p.m. shift?
>
> [Dr. Dompe's Response] ***Mr. Rahner is able to work the***

---

[7] Rahner believed that Higgins "hated him" from the time he transferred to Metro in late 2008/early 2009. Att. 1, ¶ 137.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 11
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

**3-11:30pm shift under the stated accommodations.**

*Id.* (emphasis added); *see also* Dompe Dep. 97:11-98:6, 100:24-101:11 (confirming that Rahner was able to work the 3 p.m.-11:30 p.m. shift with the accommodation of three 15-minute rest breaks per shift) (Sullivan Weiss Decl., Ex. 2).   In his deposition, Dr. Dompe emphasized that neither the time of day nor the type of work presented any issues to Rahner's health.  Att. 1, ¶ 146.  To the contrary, as long as the job permitted Rahner to take up to three 15-minute breaks per shift, Rahner could perform the night GA reporter position.

> Q.     And upon representation by The Seattle Times Company
>        that this was a position that would allow him to take these
>        rest breaks, you were comfortable that he would be able to
>        perform the job, provided the rest breaks were available?
>
> A.     Correct.

Dompe Dep. at 98:1-6, 97:11-19 (Sullivan Weiss Decl., Ex. 2).

> **3.     Rahner Abandons The Interactive Process and Never Returns to Work.**

On January 7, 2011, STC notified Rahner that he had not shown up for work several days in a row and that further refusal to report would be considered job abandonment.  Att. 1, ¶ 148. In response, Rahner opined that the night shift would harm his health (contrary to his doctor's assertions) and refused to report for work.  Att. 1, ¶ 149.  Despite not attempting the evening shift with the stated accommodations, Rahner nevertheless claimed it would irreparably harm his health.  *Id.*  He demanded "flexibility" and "independence" on a shift other than the evening shift.  Att. 1, ¶ 151.  He demanded to "come and go as needed for [his] medical condition."  *Id*. Rahner did not want to call his supervisors when he was going to be late for his shift.  Att. 1, ¶ 153.  He did not want to work any set hours.  Att. 1, ¶ 154.

Rahner did not show up on January 10, 2011.  Att. 1, ¶ 155.  The following day, STC notified Rahner that he had abandoned his job, resulting in separation from employment.  Att. 1, ¶ 156. Rahner shut down the interactive process refusing to try the evening GA shift with the stated accommodations of three 15-minute breaks, as needed.

> Q:     But you never worked the night shift after The Times said
>        that they would commit to giving you three 15-minute
>        breaks to be taken as needed during the eight-hour shift, is

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 12
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1

that correct?

A:      That is correct.

2

Pl's Dep. at 175:6-10 (Sullivan Weiss Decl., Ex. 1).

3

### G.      Rahner's Agency Charge and EEOC Investigation.

4

On February 28, 2011, Rahner filed a charge of discrimination with the Equal

5

Employment Opportunity Commission ("EEOC"), alleging disability discrimination and

6

retaliation.  Att. 1, ¶ 158.  Following an investigation, the EEOC notified Rahner that it intended

7

to dismiss his charge.  In doing so, it observed that "it does not appear that there is evidence to

8

show that discrimination based on violation of the [ADA] happened."  Att. 1, ¶ 159.  The EEOC

9

further explained that Rahner "made it clear that [he] was unhappy working in Metro"; that "late

10

arrivals and lack of enthusiasm and productivity made [him] ineffective in this early day

11

assignment" (*i.e.*, the 9:00am shift); and that STC's decision to move Rahner to the evening shift

12

was based on legitimate, nondiscriminatory business needs.  *Id.*[8]  This lawsuit followed.

13

### III.      AUTHORITY AND ARGUMENT

14

### A.      Rahner's Failure to Accommodate Claim Fails.

15

Rahner cannot establish that STC failed to accommodate his CFS.  To state a *prima facie*

16

claim for failure to accommodate under the ADA, a plaintiff must show that "(1) [he] is disabled

17

within the meaning of the ADA; (2) [he] is a qualified individual able to perform the essential

18

functions of the job with reasonable accommodation; and (3) [he] suffered an adverse

19

employment action because of [his] disability." *Samper v. Providence St. Vincent Med. Ctr.,* 675

20

F.3d 1233, 1237 (9th Cir. 2012) (quotation and citation omitted).   A prima facie claim for failure

21

to accommodate under the WLAD is similar to the ADA: a plaintiff must show (1) that he had a

22

sensory, mental, or physical abnormality that substantially limited his or her ability to perform

23

the job; (2) that he was qualified to perform the essential functions of the job in question; (3) that

24

he gave his employer notice of the abnormality and its accompanying substantial limitations; and

25

(4) upon receiving notice, the employer failed to affirmatively adopt measures that were

26

27

[8] A U.S. District Court may properly use EEOC findings as "highly probative" evidence on summary judgment. *See, e.g., Plummer v. Western Int'l Hotels Co.,* 656 F.2d 502, 505 (9th Cir. 1981); *Nelson v. Pima Cmty. College,* 83 F.3d 1075, 1080 (9th Cir. 1996).

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 13
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

available to and medically necessary to accommodate the abnormality.  *See Riehl v. Foodmaker, Inc.,* 152 Wn.2d 138, 145, 94 P.3d 930 (2004).  Rahner asserts his claims based on his diagnosis of Chronic Fatigue Syndrome.  *See* Pl's Dep. 21:17-20, Ex. 1 to Sullivan Weiss Decl.[9]

**B.      Rahner Was Not A Qualified Individual.**

**1.      Predictable Attendance and Punctuality are Essential Job Functions.**

Punctuality and predictable and regular attendance were essential job functions for Rahner's role as a breaking news GA reporter.  Att. 1, ¶ 12.  Regular, predictable attendance *is* an essential function when a job requires "on-site presence" to be performed.  *Samper*, 675 F.3d at 1238.  Rahner bears the burden of proving that he was qualified to perform the essential functions of his job with or without reasonable accommodation.  *See Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 990 (9th Cir. 2007); *Davis v. Microsoft Corp.*, 149 Wn.2d 521, 532, 70 P.3d 126 (2003).  Correspondingly, STC bears the burden of establishing which of Rahner's job functions were essential.  *Bates*, 511 F.3d at 991.  To determine a job's essential functions, "[c]onsideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written description of the job before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."  42 U.S.C. § 12111(8); 29 C.F.R. § 1630.2(n)(3)(i) and (ii).  The Court may also consider "the consequences of not requiring the [employee] to perform the function." 29 C.F.R. § 1630.2(n)(3)(iv).

The *Samper* Court found that the employer "supplie[d] evidence to meet its burden … [that punctuality and attendance were essential functions] with alacrity," by providing evidence that (1) Samper's written job description requires adherence to the attendance policy; and (2) a declaration from Samper's supervisor indicating that understaffing could compromise patient care. *Samper*, 675 F.3d at 1238.  The Court noted further that Samper's admissions and the "common-sense" conclusion that an acute care hospital employee's regular and predictable

---

[9] In light of the summary judgment standard, and for purposes of this motion only, STC assumes that Rahner has a qualifying disability.  Defendant reserves the right to challenge the validity of Rahner's alleged disability going forward.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (No. 2:12-cv-00880-JCC) - 14
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1   presence was necessary to perform her job provided additional support for the employer's

2   position. *Id.*

3        The evidence here similarly establishes that reliably arriving to work punctually and

4   adhering to a predictable schedule are essential functions of Rahner's position. ***First***, the

5   reporter job description identifies punctuality as an essential job function. Att. 1, ¶12. ***Second***,

6   STC provided testimony from Rahner's editors that punctuality and maintaining a predictable

7   schedule are necessary to provide the breaking-news coverage Rahner was responsible for

8   providing. Att. 1, ¶¶ 12-14. Rahner was supposed to be available to cover the top stories of the

9   day as one of only a handful of non-specialist GA reporters. Att. 1, ¶ 31-38. While attendance

10  and punctuality is important for everyone, it is particularly important for a GA reporter to be

11  available in the morning hours. Att. 1, ¶12, Higgins Decl. ¶ 5-7, 14. The bow wave of GA news

12  stories and assignments takes place between 9 - 11 a.m. Higgins Decl. ¶ 6. Rahner's

13  unpredictable schedule and routine absences in the morning hours meant that Rahner could not

14  be counted on to do the work, and the lion's share of the work had been assigned by the time he

15  showed up. *Id.* As a result, Rahner flew under the radar and essentially avoided taking

16  assignments. *Id.* ***Third***, as in *Samper*, it defies logic that Rahner could be an effective breaking

17  news reporter if he is not present or available on a predicable basis to get assignments and cover

18  the news of the day. This evidence amply satisfies STC's burden, and Rahner has no persuasive,

19  admissible evidence to counter it.

20        **2.      Rahner is Not Qualified Since He Rejected STC's Reasonable**
          **Accommodations and Abandoned the Interactive Process.**

21        Rahner cannot meet his burden to show he is a ***qualified individual*** because he

22  ***abandoned the interactive process*** and rejected STC's reasonable accommodations. STC

23  offered Rahner reasonable and promising accommodations in light of Rahner's difficulty

24  reporting to work in the mornings. ***First***, STC offered Rahner intermittent FMLA leave,

25  requesting only that Rahner telephone the newsroom when he felt he was not able to report to

26  work on time, or at all. Att. 1, ¶ 59-60; Higgins Decl. ¶11. Rahner never responded to STC's

27

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 15
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1    suggestion that he go on intermittent FMLA leave so that the newsroom could manage its

2    schedule and resources while providing Rahner the time off he claimed to need.  Att. 1, ¶¶ 64-68.

3    **Second**, STC planned to reassign him to the evening shift in part to eliminate the need for him to

4    report to work during the morning hours.  Att. 1, ¶¶ 80, 90-99.  **Third**, STC agreed to provide

5    Rahner several 15-minute breaks per shift – the precise and only accommodation recommended

6    by Rahner's doctor.  Att. 1, ¶¶ 126, 127.

7    　　Rahner's response was to refuse to report to work and abandon his job if STC would not

8    provide him the patently unreasonable accommodation he insisted on.  Att. 1, ¶¶ 128, 132, 150-

9    153.  Rahner never even attempted to work the evening shift with the rest break accommodations

10   STC was ready and willing to provide.  Att. 1, ¶ 156.  In *Keever v. City of Middleton*, 145 F.3d

11   809 (6th Cir. 1998), the Sixth Circuit considered whether a police officer who could no longer

12   perform his position due to attendance issues was qualified after he turned down a reassignment

13   to a desk job.  The police officer wanted to work a less stressful shift or a detective shift and

14   thought the desk job was demeaning and would be less satisfying than his prior job.  *Id.* at 811-

15   12.  The court upheld summary judgment in favor of the employer concluding that the

16   employer's offer of accommodation was reasonable and the officer was not qualified since he

17   refused the offer.  *Id.* at 813.

18   　　The facts in this case are similar to the facts in the *Keever* case.  Like Keever, Rahner

19   rejected STC's reasonable accommodation of reassignment to the evening shift with a rest break

20   accommodation (a shift he considered not suited to his talents and experience) because he

21   wanted STC to provide him with the accommodation he preferred.  Att. 1, ¶¶ 128, 132, 150-153.

22   When Rahner refused the reasonable accommodation offered by his employer, he is no longer a

23   qualified individual able to perform the essential functions of the job.  *Id.* at 813;  20 C.F. R. §

24   1630.9(d) (providing that if an employee rejects the offered reasonable accommodation that is

25   necessary to enable the individual to perform the essential functions of the position the individual

26   will not be considered a qualified individual with a disability).  Rahner's rejection of the

27   accommodation and withdrawal from the interactive process is fatal to his reasonable

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 16
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1    accommodation claim.

2        **C.    Rahner's Proposed Accommodation of a Discretionary Schedule is**
         **Unreasonable.**

3

4        Employers must "reasonably accommodate the … limitations of disabled employees

5    unless the accommodation can be shown to impose an undue hardship on the employer's

6    business." *Snyder v. Medical Servs. Corp. of E. Wash.*, 145 Wn.2d 233, 239, 35 P.3d 1158

7    (2001).  Importantly, an "employer is not obligated to provide an employee the accommodation

8    he requests or prefers, the employer need only provide some *reasonable* accommodation."

9    *Zivkovic v. Southern California Edison Co*., 302 F.3d 1080, 1089 (9th Cir. 2002) (internal

10   quotation marks omitted) (emphasis added); *see also Sharpe v. Am. Tel. & Tel. Co.*, 66 F.3d

11   1045, 1050 (9th Cir. 1995); *Doe v. Boeing Co.,* 121 Wn.2d 8, 18, 846 P.2d 531 (1993); *Dean v.*

12   *Metro. Seattle,* 104 Wn.2d 627, 633, 708 P.2d 393 (1985); *US Airways, Inc. v. Barnett*, 535 U.S.

13   391, 410, 122 S.Ct. 1516 (2002); *Molloy v. City of Bellevue,* 71 Wn. App. 382, 859 P.2d 613

14   (1993) (employer "had no duty to exempt [employee] from [its] policy or to create a special

15   position within the department for him).  Likewise, employers are not required to create special

16   positions or standards:

17           The employer does not have a duty to reassign an employee to an
             already occupied position, create a new position, alter the
18           fundamental nature of the job, eliminate or reassign essential job
             functions, provide a new supervisor, give the employee preference
19           over a more qualified employee, or necessarily grant a specific
             request.

20   *Riehl*, 152 Wn.2d at 146.  EEOC interpretive guidance states: "the employer providing the

21   accommodation has the ultimate discretion to choose between effective accommodations, and

22   may choose the less expensive accommodation or the accommodation that is easier for it to

23   provide." Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Part

24   1630, App., 56 Fed.Reg. 35726-01, 35749 (July 26, 1991), cited in *EEOC v. UPS Supply Chain*

25   *Solutions*, 620 F.3d 1103, 1110 -1111 (9th Cir. 2010).

26       Throughout the nearly year-long interactive process, Rahner or his union representative

27   proposed only two accommodations: either STC create a new position starting at 11 a.m., or

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 17
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

permit Rahner to be "independent," come and go as he pleased, work whenever he felt up to it wherever he wanted, and he wanted to be able to do so without any obligation to report to his editors when was available to work.  Att. 1, ¶¶ 128, 130, 132, 150-153.  These accommodation requests are facially unreasonable.  *Pickens v. Soo Line R.R. Co.*, 264 F.3d 773, 778 (8th Cir. 2001) (holding that plaintiff's assertion he should be allowed, as a disability accommodation, to "work only when he feels like working" is "unreasonable as a matter of law"); *Kendall v. Ashcroft (DOJ)*, 2005 EEOPUB LEXIS 350 (EEOC 2005) (holding that the employer was not required to let the employee, a Research Specialist with sleep disorders, "report to work whenever he was able"); *Riehl*, 152 Wn.2d at 146 (no duty to create a position).

### D.    Rahner Did Not Suffer Any Adverse Employment Action Because of His Disability.

Rahner cannot show that he was subjected to an adverse employment action.  Courts require "an actual adverse employment action, such as a demotion or adverse transfer, or a hostile work environment that amounts to an adverse employment action." *Kirby v. City of Tacoma*, 124 Wn. App. 454, 465, 98 P.3d 827 (2004).  It must involve more than an "inconvenience or alteration of job responsibilities." *Id.* (citations omitted).

STC's decision to move Rahner to the evening shift was a *reasonable accommodation for his CFS*, not an adverse employment action. *McGregor v. Nat'l R.R. Passenger Corp.*, 187 F.3d 1113, 1115 (9th Cir. 1999) (reassignment is a reasonable accommodation); *see also* 42 U.S.C. § 12111(9)(B) (same); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999) ("reassignment need not involve a promotion, and the employer has the authority to pick and choose which appropriate vacant job is to be offered" to the employee needed accommodation).

To the extent Rahner claims his *voluntary* decision to abandon his job and STC's subsequent decision to officially terminate his employment is an adverse employment action, STC can easily establish that STC did not make that decision because of his disability.  It is undisputed that Rahner withdrew from the interactive process and refused to return to work after STC offered him the reasonable accommodations recommended by his doctor.  Att. 1, ¶ 154-156.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 18
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

Rahner was required to work with the STC collaboratively to develop a reasonable accommodation and to try the accommodation that STC offered.  *Zivkovic,* 302 F.3d at 1089.  ***An employer is not liable for a failure to accommodate claim if it is not responsible for a breakdown in the collaborative process***.  *Id.*  Indeed, an employee's failure to cooperate in identifying a reasonable accommodation can undermine a claim. *See Allen v. Pac. Bell*, 348 F.3d 1113, 1116 (9th Cir. 2003); *See also Washburn v. Gymboree Retail Stores*, Inc., C11-822RSL, 2012 U.S. Dist. LEXIS 125378, at *34 (W.D. Wash. Sept. 4, 2012).  Accordingly, STC's offer of a reasonable accommodation and formalization of Rahner's job abandonment do not constitute adverse employment actions.

**E.      Rahner Cannot Establish Disability Discrimination under ADA or WLAD.**

Rahner's claim of disability discrimination fails.  A disparate treatment claim based on circumstantial evidence is subject to the *McDonnell Douglas* three-step, burden-shifting protocol. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817 (1973); *see also Hegwine v. Longview Fibre Co., Inc.*, 162 Wn.2d 340, 354, 172 P.3d 688, 696 (Wash.,2007). Under *McDonnell Douglas*, Rahner bears the initial burden of setting forth sufficient facts to establish a prima facie case by showing: (1) he belongs to protected class; (2) he suffered an adverse employment action; (3) he was doing satisfactory work; and (4) was replaced by a person outside the protected class.  *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 917 (9th Cir. 1996); *Domingo v. Boeing Employees' Credit Union*, 124 Wn. App. 77, 80, 98 P.3d 1222 (Div. 1 2004) (citations omitted).  If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for taking the adverse employment action. *Id.*  If the employer articulates a facially nondiscriminatory reason for taking the employment action, the burden returns to the plaintiff to prove that the defendant's articulated reason was a pretext for discrimination.  *Id.*

**1.      Rahner cannot establish a prima facie case of disparate treatment.**

Rahner cannot make a prima facie case.  ***First***, Rahner has not shown he was subjected to an adverse employment action.  In his deposition, Rahner testified that this claim is based on

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 19
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

1    STC's decision to move him to the evening shift, which led to his refusal to return to work.  Pl's

2    Dep. 220:8-23; 222:6-22. For the same reason as set forth above in Section III.E, the move to the

3    evening shift was a reasonable accommodation, not an adverse employment action. ***Second***,

4    Rahner did not perform his job satisfactorily – neither before his diagnosis, nor after.  His editors

5    identified and discussed his performance deficiencies shortly after he started on the Metro desk

6    and months before Rahner was diagnosed with CFS.  Att. 1, ¶¶ 49, 53, 54, 76-78.  STC's

7    performance evaluation put Rahner on notice that his performance was substandard for reasons

8    completely unrelated to his CFS and had been for months prior to his diagnosis. *Id.*  Rahner

9    himself acknowledges that the job was a poor fit and he was not happy in it.  Att. 1, ¶¶ 43-48.

10   ***Third***, Rahner cannot establish that he was replaced by another person outside of the protected

11   class to which he purportedly belongs.  STC did not hire another Metro reporter for nearly two

12   years after Rahner abandoned his position.  Att. 1, ¶ 20.

13                    **2.      STC has legitimate business reasons for its decisions.**

14                    Even if Rahner could establish his prima facie case, which he cannot, STC has legitimate

15   business reasons for its decision to move Rahner to the evening shift.  The position was open,

16   Rahner was determined to be the best fit, Rahner had demonstrated that he needed to be in a GA

17   role where stories would be assigned to him on a daily basis, and the position allowed for Rahner

18   to work a full shift during the hours STC determined it needed coverage.  Att. 1, ¶¶ 79, 87-99.

19   STC can easily establish that its reasons for moving Rahner to the evening shift were based on

20   business need. *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004)

21   (evidence of termination for a non-discriminatory reason rebuts Plaintiff's prima facie case).

22                    **3.      Rahner has no evidence showing that STC's reasons are pretextual.**

23                    Rahner cannot show that STC's stated reasons for changing his schedule were pretextual.

24   To do so, Rahner must offer "specific, substantial evidence" that STC's articulated reason for its

25   decision was merely a pretext for unlawful discrimination to avoid summary judgment. *Bradley*

26   *v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996).  No such evidence exists.

27

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 20
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

**F.      Rahner Cannot Establish Hostile Work Environment.**

Rahner's hostile work environment claim is absurdly thin and cannot survive summary judgment.  Rahner asserts he was subjected to a hostile work environment because of his "tardiness and for the symptoms of his medical condition."  Compl. ¶ 48 (Dkt. #1); Pl's Dep. 9-20.  He contends that he is entitled to damages because editors allegedly commented about his late arrivals to work, including that Rahner "didn't like mornings," "Hey, look everybody, Rahner's here," and otherwise discussed his late arrivals to the office with him.  Pl. Dep. at 87:4-11; 89:16-18; 89:3-11.  These allegations are insufficient to maintain a hostile work environment claim.[10]

As a preliminary matter, the Ninth Circuit has declined to determine whether a plaintiff may maintain a hostile work environment claim under the ADA.  *See Brown v. City of Tucson*, 336 F. 3d 1181, 1190 (9th Cir. 2003) ("Our court has not yet held that such a claim exists, let alone what its source in the statute may be.  We decline to do so here").

In the event the Court recognizes a hostile work environment claim under the ADA, Rahner's claim still fails on the merits under both state and federal law.  A plaintiff asserting a discrimination-based hostile work environment claim must show: "(1) that he or she was disabled within the meaning of the antidiscrimination statute, (2) that the harassment was unwelcome, (3) that it was because of the disability, (4) that it affected the terms or conditions of employment, and (5) that it was imputable to the employer."  *Robel v. Roundup Corp*, 148 Wn.2d 35, 45, 59 P.3d 611 (2002) (adopting federal standards for disability-related hostile work environment cases under the WLAD); *see e.g.*, *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).  The fourth element requires that Rahner prove severe or pervasive conduct sufficient to create an objectively hostile or abusive work environment.  *Harris v. Forklift Sys., Inc.* 510 U.S. 17, 21, 114 S.Ct. 367 (1993); *Robel,* 148 Wn.2d at 46.  "Casual, isolated or trivial manifestations of a discriminatory environment do not affect the terms or conditions of

---

[10] Rahner also alleges hostile work environment because (1) he was assigned to the night shift and (2) STC allegedly refused to make a reasonable accommodation.  Pl. Dep. at 86:21-89:11.  These grounds are duplicative of Rahner's other claims, and are more properly analyzed under those separate frameworks.

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 21
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

employment to a sufficiently significant degree to violate the law." *Washington v. Boeing Co.*, 105 Wn. App. 1, 10, 19 P.3d 1041 (2000); *Glasgow v. Georgia-Pac. Corp.*, 103 Wn.2d 401, 406, 693 P.2d 708 (1985) (same); *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275 (1998). Behavior that is "merely offensive" and not "so extreme as to amount to a change in the terms and conditions of employment" is not sufficient to escape summary judgment. *Adams v. Able Bldg. Supply, Inc*., 114 Wn. App. 291, 296-97, 57 P.3d 280 (2002). *See also, e.g., Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 19 (1st Cir. 2006) (analysis of whether hostile work environment existed depends on "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with an employee's work performance.").

Here, Rahner has offered no evidence that STC's alleged conduct altered the terms and conditions of his employment. It was neither severe nor pervasive. The alleged comments—that Rahner "didn't like mornings," "Hey, look everybody, Rahner's here," and discussions about his tardiness—cannot even charitably be characterized as "merely offensive." These innocuous statements fall far short of the hostile work environment bar. *See e.g., Murphy v. BeavEx, Inc.*, 544 F. Supp.2d 139, 150-52 (D. Conn. 2008) (summary judgment granted where conduct included posting of "award" for "Stupid Employee of the Month" and caricature of Special Olympian); *Queen v. Hard Rock Hotel & Casino*, 2:11-CV-00279-RLH, 2011 WL 6753011, at *4 (D. Nev. Dec. 22, 2011) (unpublished) (claim dismissed on summary judgment where conduct included placing a handicapped placard on employee's locker and calling him a "crip"). Rahner has failed as a matter of law to meet his burden to establish a prima facie case of a hostile work environment.

G.   **Rahner's Wrongful Discharge and Negligent Infliction of Emotional Distress Claims Are Duplicative And Must Be Dismissed.**

Rahner common law claims for both (1) wrongful discharge[11] and (2) negligent infliction

---

[11] While it is difficult to ascertain from the Complaint, STC believes that Rahner's "Wrongful Discharge – Actual" claim is intended to be a claim for wrongful discharge in violation of public policy. As a procedural matter, the claim is improperly pleaded and cannot survive under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955 (2007). Compl. at ¶¶ 50-51. Rahner's conclusory allegations, even under the Court's notice-pleading

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 22
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

of emotional distress ("NIED") should be dismissed as duplicative.  Compl. ¶¶ 50-53.  It is well established that a plaintiff may not maintain separate and duplicative emotional distress  or wrongful discharge in violation of public policy claims based on the same operative facts supporting a discrimination claim.  *See Francom v. Costco Wholesale Corp.*, 98 Wn. App. 845, 864-65, 991 P.2d 1182 (2000) (court properly dismissed NIED claim because it arose from the same facts as discrimination claim and thus was "duplicative"); *Wilton v. Master Solutions, Inc.*, No. C12-66RSL, 2013 WL 1561927, at *8 (W.D.Wash., Apr. 12, 2013) (dismissing NIED claim on summary judgment as "duplicative" of discrimination claims); *Jones v. Rabanco, Ltd.*, 439 F. Supp. 2d 1149, 1166 (W.D. Wash. 2006) (Pechman, J.) (dismissing wrongful discharge claim where plaintiff had adequate remedy under WLAD); *Korslund v. DynCorp Tri-Cities Servs., Inc.*, 156 Wn.2d 168, 183, 125 P.3d 119 (2005) (refusing to recognize wrongful discharge claim under Energy Reorganization Act, where ERA already provided adequate remedies).

## IV.    CONCLUSION

For all of the foregoing reasons, Defendant The Seattle Times Company respectfully requests that the Court to grant summary judgment and dismiss all of Plaintiff's claims with prejudice.

DATED this 8th day of July, 2013.

DAVIS WRIGHT TREMAINE LLP
Attorneys for Defendant The Seattle Times
Company

By   /s Sheehan Sullivan Weiss
       /s Devin Smith                                    .
Sheehan Sullivan Weiss, WSBA #33189
Devin Smith, WSBA #42219
1201 Third Avenue, Suite 2200
Seattle, WA  98101-3045
Telephone: (206) 622-3150
Fax: (206) 757-7700
Email: sulls@dwt.com
Email: devinsmith@dwt.com

standards, is insufficient.  In addition, Rahner mistakenly seeks FMLA liquidated damages in his Request for Relief where he has not pleaded an FMLA claim.

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax

**CERTIFICATE OF SERVICE**

1

2          I hereby certify that on the date below stated, I electronically filed the foregoing

3  document with the Clerk of the Court using the CM/ECF system, which automatically sends

4  notification of such filing to the following:

5          IMPACT LAW GROUP
6          Attn: Sage Linn
           Attn: Caitlin DiMotta
7

8
           DATED this 8th day of July, 2013.
9

10

11                          By    s/ Sheehan Sullivan Weiss
                                  Sheehan Sullivan Weiss
12                                Davis Wright Tremaine LLP
                                  1201 Third Avenue, Suite 2200
13                                Seattle, WA  98101
                                  Telephone: (206) 757-8152
14                                Fax:  (206) 757-7152
                                  Email: sheehansullivanweiss@dwt.com
15

16

17

18

19

20

21

22

23

24

25

26

27

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(No. 2:12-cv-00880-JCC) - 24
DWT 22154217v6 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA  98101-3045
206.622.3150 main · 206.757.7700 fax