**<u>RAHNER v. THE SEATTLE TIMES COMPANY</u>**
**USDC Western District of Washington at Seattle Cause No. 2:12-cv-00880**

**Defendant's Statement of Undisputed Facts**

| UNDISPUTED FACT | SOURCE |
|---|---|
| **A.    The Seattle Times** | |
| 1.  Founded in 1896, *The Seattle Times* ("*The Times*") is a local, family-owned newspaper with a Sunday circulation of nearly 350,000. | **Declaration of Suki Dardarian ("Dardarian Decl.") ¶ 4** |
| 2.  It is one of the last great regional papers in the country and has won nine Pulitzer Prizes. | *Id.* |
| 3.  *The Times'* headquarters is located in South Lake Union neighborhood of Seattle.  That location hosts the majority of the company's operations, including the newsroom where Plaintiff worked. | *Id.* |
| 4.  The newsroom consists of four primary reporting departments: local news (also known as the "Metro desk"), sports, features, and business and technology. | **Declaration of Mark Higgins ("Higgins Decl.") ¶ 4** |
| 5.  *Times* reporters work certain shifts in order to meet deadlines and ensure adequate and quality coverage. | *Id.* |
| 6.  The Metro desk follows three shifts: the early morning shift (starting at 7 a.m.), the day shift (9 a.m. to 6 p.m.), and the evening shift (3 p.m. to 11:30 p.m.). | *Id.* |
| 7.  Within Metro, individual reporters perform distinct functions and duties specific to their assignments. For example, some reporters hold "enterprise" beats: they conceptualize and produce periodic reports on general topics or themes, such as the environment. | **Higgins Decl. ¶ 5** |
| 8.  Enterprise reporters generally do not respond to press releases or breaking news events. Instead, they primarily develop their own story ideas. | *Id.* |
| 9.  By contrast, other beats are essentially reactive, such as the "police beat" or the "courts beat." Those reporters primarily cover daily news occurrences. | *Id.* |

1

| UNDISPUTED FACT | SOURCE |
|---|---|
| 10. One such position is the general assignment beat that the Plaintiff, which covers breaking news and fills coverage gaps. | **Higgins Decl. ¶ 5, 9** |
| 11. That position produces daily stories for the print edition and often publishes intermittent updates on *the Times'* website. | **Higgins Decl. ¶ 5** |
| 12. While punctuality and attendance is important for all reporters, adhering to a strict schedule is especially important for such reporters because of the role they fill. | **Higgins Decl. ¶¶ 6, 16** |
| 13. The news operation relies on those reporters for important work that cannot be postponed. | **Higgins Decl. ¶ 5** |
| 14. Therefore, if they fail to timely report to work, coverage suffers and other reporters often must abandon their duties to cover for the missing staffer. | **Higgins Decl. ¶¶ 4-7**<br><br>**Dardarian Decl. ¶¶ 12, 27** |
| 15. In light of the financial challenges facing news outlets—and newspapers in particular—in the last ten years, the paper has been shrinking. | **Dardarian Decl. ¶ 5** |
| 16. *The Times* has been forced to reduce its staff in recent years. Its workforce, including the editorial staff, has been reduced dramatically over the past five or six years. | *Id.* |
| 17. The newsroom has laid off employees, left multiple positions open, and cut back on a host of expenses in an effort to reduce costs. | *Id.* |
| 18. While STC has been adapting to this new environment for much of the last 10 years, 2008 was a particularly challenging year resulting in a sweeping restructuring of the newsroom departments. | **Dardarian Decl. ¶ 7** |
| 19. STC downsized its Features desk, where Plaintiff had worked for eight years. | **Dardarian Decl. ¶ 7**<br><br>**Higgins Decl. ¶ 8** |
| 20. Since 2004, the Metro News Department has not added a single reporter (other than interns or residents). | **Higgins Decl. ¶ 8** |
| 21. The reporters who remain with the paper are forced to do more with less. | **Dardarian Decl. ¶ 5** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| 22. Many departments and beats have been eliminated, reshuffling experienced reporters into less coveted, but critical, newsroom roles. | **Dardarian Decl. ¶¶ 5, 7** |
| **B.     Plaintiff's Employment with STC** | |
| 23. STC hired Plaintiff Mark Rahner in 1999 as a freelance reporter. | Let's see.  I started at the newspaper in '99, **Ex. 1 to Sullivan Weiss Decl. (Rahner Dep.) Rahner Dep. 14:23**<br><br>Q.   Okay.  So, let's talk about your employment at The Seattle Times.  If I have this right, you started at The Times, was it, in 1999?<br>A.   That sounds right.<br>Q.   What role did you start at?<br>A.   I believe I started by doing freelance and then I was a temporary employee and then I was hired on full time as the pop culture writer.<br>**Rahner Dep. 33:5-12** |
| 24. The following year, STC hired Rahner as a full-time reporter in the Features department. | Q.   When did that occur that you were hired full time?<br>A.   I think 2000.<br>**Rahner Dep. 33:13-15** |
| 25. For the next eight years, Rahner covered pop culture in Features. | Q.   When did that occur that you were hired full time?<br>A.   I think 2000.<br>Q.   Do you recall the date that your employment ended?<br>A.   The date that it ended?  It would have been January 2011.<br>Q.   So, I want to focus on the last five years, your last five years at The Times.  Okay?<br>A.   Okay.<br>Q.   So, that would be 2005 through 2010.<br>A.   Okay.<br>Q.   What positions did you hold at The Times between 2005 and 2010?<br>A.   I was a pop culture writer still until they disappeared the features department and then I moved to Metro news for the last two years, roughly two years. |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q. So, from 2005 until 2008 you were in features?<br>A. That sounds about right.<br>Q. And you were the pop culture writer; is that right?<br>A. Correct.<br>**Rahner Dep. 33:13-34:9**<br><br>Q. So, you were -- I want to make sure I have this right. So, you would have been the pop culture reporter on pop culture writer for The Times from about 2000 to 2008?<br>A. Yes.<br>**Rahner Dep. 40:1-5** |
| 26. Rahner often wrote about concerts, comic books, comedy, restaurants, and entertainment-related events. | Q. Tell me about how in your view it's a different universe.<br>A. Well, features involved doing interviews, reviews, a lot of critic work, a lot of writing about events that were going on, books, movies, comic books, comedy, you know, pop culture, what we generally understand as pop culture, anything that involved that. I was kind of a jack-of-all-trades and staff nerd, I guess.<br>**Rahner Dep. 38:17-24** |
| 27. Rahner did not work set hours or a "formal shift" while covering pop culture given the nature of the events and topics he covered. | Q. Were you on a day shift in features?<br>A. There were no set hours because, you know, there were nighttime reviews of things and it was mainly a matter of everybody knowing what their work was and handing it in on time. So, there were no formal shifts because we were treated like adults.<br>**Rahner Dep. 37:10-15** |
| 28. Rahner rarely covered breaking news and was primarily focused on long-form pop culture stories with multi-week deadlines. | **Dardarian Decl. ¶ 6** |
| 29. Rahner generally worked without short-term or daily deadlines. | *Id.* |
| 30. When STC reduced the Features department in | Q. When you say they disappeared |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| 2008, STC moved Rahner to the Metro news department (a/k/a the "Metro desk") instead of terminating his employment. | features – <br> A.  They eliminated the department.  They were downsizing the newsroom. <br> Q.  What was your understanding of the reason for downsizing the newsroom in 2008? <br> A.  Well, the whole newspaper industry has been in a downward spiral.  They were having financial difficulties, like every other newspaper. <br> Q.  Was the move -- let me strike that. Was the elimination of the features department part of a larger reduction in force or something where people lost their jobs at that time? <br> A.  I believe so.  It was an ongoing process of shrinkage. <br> Q.  So, you didn't lose your job in 2008, correct? <br> A.  No. <br> Q.  You moved over to the Metro desk in 2008? <br> A.  Correct. <br> **Rahner Dep. 35:2-19** |
| 31. Rahner became a General Assignment ("GA") reporter. | Q.  So, in 2008 you moved over to the Metro desk and you held the same title; is that correct? <br> A.  Well, I wasn't the pop culture writer anymore because there was no pop culture coverage.  I was a general assignment reporter in news after that. <br> Q.  Okay.  So, you considered your title to be pop culture reporter prior to moving to the Metro desk? <br> A.  I didn't "consider" it.  That's what it was. <br> Q.  Then your title, when you moved over to the Metro desk, was general assignment reporter? <br> A.  Correct. <br> **Rahner Dep. 36:14-24** |
| 32.  Unlike his prior role as the pop culture reporter, as a GA reporter, he was expected to cover | **Higgins Decl. ¶¶ 5, 8** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| breaking news and the "news of the day." | Q. So, I think you've touched on this a little bit, but I want to make sure I understand. When you're talking about doing the pop culture writing in the features department, that's different than breaking news, right?<br>A. There's some news in that, but yeah, it's largely different. I mean, you have beats that you know and not so much as breaking, because you're aware of what's going on and preparing for anything that happens because you're an expert in your field.<br>Q. So, when you went over to the general assignment desk, you were now working on sort of whatever the news of the day was; is that correct?<br>A. Mostly.<br>Q. So, when you left the office on Tuesday and come back on Monday -- sorry, come back on Wednesday, you may not have any idea what the day will hold in terms of stories or what you need to do; is that correct?<br>A. A lot of times. There were some ongoing things that I would be working on from time to time, but those would be tossed aside if anything else happened to take me off it.<br>**Rahner Dep. 44:9-45:5** |
| 33. GA reporting is very different than pop culture reporting. | Q. So, I think you've touched on this a little bit, but I want to make sure I understand. When you're talking about doing the pop culture writing in the features department, that's different than breaking news, right?<br>A. There's some news in that, but yeah, it's largely different.<br>**Rahner Dep. 44:9-15** |
| 34. The role that Rahner was expected to fill was deadline driven and often involved assignments for stories due the same day. | **Higgins Decl. ¶¶ 8, 14, 16** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| 35. Editors assign stories to GA reporters that the editors believe should be included in the following day's paper (and printed online). | Higgins Decl. ¶ 5.<br><br>Q. How do you get your work? How do you block out your day? How do you get assignments? Do you generate assignments or generate stories?<br>A. More often than not I'd be given an assignment based on what was going on or an idea an editor had to fill the next day's paper. I would try to generate assignments of my own when possible, but that was the exception and not the rule.<br>**Rahner Dep. at 46:19-47:1** |
| 36. GA reporters are also expected to generate their own story ideas, and to pitch these ideas to their editors. This is called "enterprise" reporting. | **Higgins Decl. ¶ 16**<br><br>I would try to generate assignments of my own when possible, but that was the exception and not the rule.<br>**Rahner Dep. 46:24-47:1**<br><br>Q. Do you remember talking to Matt Kreamer, Mark Higgins, and Jim Simon about their expectation that you would generate story ideas?<br>A. That's expected of everybody.<br>Q. Do you remember specifically having a conversation with them about that during that time?<br>A. Only in the most general terms. Everybody there who is a reporter is expected to try and come up with story ideas when they can.<br>**Rahner Dep. 52:7-15** |
| 37. Some GA reporters focus all or nearly all of their efforts on enterprise reporting or are assigned to specific roles (e.g., producing stories for the "Pacific NW Magazine"). | **Higgins Decl. ¶ 5** |
| 38. Others, like Rahner, are expected to do both breaking news on a daily basis and enterprise reporting. | **Higgins Decl. ¶ 16**<br><br>Q. Do you remember talking to Matt Kreamer, Mark Higgins, and Jim Simon about their expectation that you would |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | generate story ideas?<br>A.  That's expected of everybody.<br>Q.  Do you remember specifically having a conversation with them about that during that time?<br>A.  Only in the most general terms. Everybody there who is a reporter is expected to try and come up with story ideas when they can.<br>**Rahner Dep. 52:7-15** |
| 39. As a GA reporter, Rahner was initially assigned to the day shift (approximately 9 a.m. – 6 p.m.). | Q.  When you moved over to the Metro desk as a general assignment reporter, were you assigned to a shift?<br>A.  Yeah, that was more rigid.  The shift technically was 9 to 5 or 6.<br>**Rahner Dep. 37:16-19** |
| **C.  Rahner is "Frustrated" With His Assignment as a GA Reporter and His Performance Declines.** | |
| 40. When STC transferred Rahner to Metro in December 2008, Metro Editor Mark Higgins welcomed him to the department. | **Higgins Decl. ¶ 8** |
| 41. Higgins was pleased to have Rahner join the Metro staff as a GA reporter. | *Id.* |
| 42. Metro had not hired a new reporter in years, and Rahner's editors hoped that he would provide much-needed support in the role. | *Id.* |
| 43. Rahner was frustrated and disappointed with his transfer to the Metro Department. | Q.  So, was it a big shift for you then to move to the Metro general assignment desk and not be able to do that same level of pop culture writing?<br>A.  Yes.<br>Q.  Was it difficult?<br>A.  Well, it was difficult in that the managers weren't very good at using the right tool for the job. And so we all, when we're hired as reporters, have skill sets, things that we're good at and have proven, demonstrated expertise at and skill at.  And one of the difficult things about going to Metro news was just sort of being treated like a gofer sometimes. |

DWT 22258718v1 0040701-001034

011

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q. What do you mean by that?<br>A. Just thrown at things willy-nilly regardless of what my own skills were.<br>Q. So, do you feel like your skills were underutilized?<br>A. To say the least.<br>Q. Tell me about that. Tell me a little bit more about what your feeling was about being underutilized.<br>A. Well, I just -- a good deal of the time I was thrown at things in the way an intern would be with no regard for what my demonstrated and widely praised work was.<br>**Plaintiff 40:6-41:4**<br><br>Q. Do you remember during one of those coffee sessions or more than one of those coffee sessions talking about how you were unhappy at Metro desk?<br>A. Well, that probably would have come up fairly often because I was always pitching work that was more appropriate to my demonstrated skills and seniority.<br>**Rahner Dep. 79:5-10**<br><br>Q. I'm asking questions. I'm not suggesting anything. I'm just trying to understand whether you told Kreamer that you were unhappy on the Metro desk?<br>A. I very well may have been, and I may have told him that, but I don't recall specifically a time when we were at coffee when I said, "Matt, I'm unhappy on the Metro desk."<br>**Rahner Dep. 79:20-80:1** |
| 44. Rahner's dislike of and disinterest in the GA reporting work was evident as soon as Rahner transferred to the Metro Desk. | **Dardarian Decl. ¶ 9**<br><br>**Higgins Decl. ¶ 9** |

9

DWT 22258718v1 0040701-001034

012

| UNDISPUTED FACT | SOURCE |
|---|---|
| 45. Instead of embracing his new role, he shunned its duties and tried to revert to the pop culture beat he held for the Features department, a beat that the STC no longer considered a priority. | Q. So, you wanted to continue doing the pop culture writing after you moved over to the general assignment desk?<br>A. In one form or another. I thought it was something the paper needed and I thought it was something that I was good at.<br>Q. Did you propose that to anybody, any editors?<br>A. Numerous times. Sorry, I talked over you. Numerous times.<br>Q. What was the response?<br>A. I think I can sum up the response as no.<br>Q. Did anyone provide you a reason for why they wouldn't support you doing pop culture writing on the general assignment desk?<br>A. No good reason. It was just along the lines of this isn't what we want you to focus on right now. In fact, I even offered to do things on my own time that didn't interfere with my scheduled in Metro news and was even told that I couldn't do that, and given no reason why.<br>**Rahner Dep. 41:19-42:13**<br><br>Q. So, when you started over at the Metro desk, you were starting to tell me about how you tried to incorporate some of that pop culture reporting or your expertise in pop culture into the role; is that correct?<br>A. Yes.<br>Q. You described the Q-and-A pieces?<br>A. Uh-huh, yes.<br>Q. You also talked about video reporting or videos that you created?<br>A. Yeah, I made a series of short videos, yes.<br>Q. Did you ever talk about a pop culture blog?<br>A. Yes.<br>Q. Is that something that ever went anywhere? |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A.  No.<br>Q.  Who did you talk to about the pop culture blog?  10:05:56AM<br>A.  Mainly Kreamer.<br>Q.  Was there -- was there interest in it from Kreamer?<br>A.  Not really.  I mean, as opposed to him just passing it up the chain, chain of command.<br>Q.  So, other than doing the Q-and-A pieces, the video reporting, you -- the rest of your time was spent doing the general assignment news reporting, correct?<br>A.  Correct, for the most part.<br>**Rahner Dep. 48:15-49:13** |
| 46. He considered being a GA reporter to be a "step down" from his pop culture work and merely a "gopher" or "intern" position. | Q.  Did you feel like going to become a general assignment reporter on the Metro desk was sort of a step down after being the pop culture writer for eight years?<br>A.  In a way.<br>Q.  Why is that?<br>A.  Because I was doing very distinctive, well-praised popular work prior to that, and then I was put in a situation where, as I said, I was more often than not just treated like an intern and just kind of used like a spare body with no regard for my demonstrated skills.<br>Q.  How did that make you feel?<br>A.  Are my feelings at issue here?  I don't understand.<br>Q.  How did that make you feel when you were saying-- you say that you were used like a gofer or intern?<br>A.  It was frustrating.<br>Q.  Did that affect your happiness in your job? |

11

DWT 22258718v1 0040701-001034

014

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. Of course.<br>**Rahner Dep. 42:25-43:17** |
| 47. Rahner felt the position was not suited to what he believed to be his "demonstrated and widely praised work." | Q. So, do you feel like your skills were underutilized?<br>A. To say the least.<br>Q. Tell me about that. Tell me a little bit more about what your feeling was about being underutilized.<br>A. Well, I just -- a good deal of the time I was thrown at things in the way an intern would be with no regard for what my demonstrated and widely praised work was.<br>**Rahner Dep. 40:21-41:4** |
| 48. Rahner criticized his editors for trying to put a "round peg in a square hole," and asserted that they "weren't very good at using the right tool for the job." | Q. Do you remember telling Mark that The Times was trying to put a round peg in a square hole with regard to you and the work that you were doing in Metro?<br>A. I wouldn't doubt it.<br>Q. Is that something you would say, a round peg in a square hole?<br>A. That sounds like something I could say.<br>**Rahner Dep. 153:1-7**<br><br>Q. So, was it a big shift for you then to move to the Metro general assignment desk and not be able to do that same level of pop culture writing?<br>A. Yes.<br>Q. Was it difficult?<br>A. Well, it was difficult in that the managers weren't very good at using the right tool for the job. And so we all, when we're hired as reporters, have skill sets, things that we're good at and have proven, demonstrated expertise at and skill at. And one of the difficult things about going to Metro news was just sort of being treated like a gofer sometimes.<br>Q. What do you mean by that?<br>A. Just thrown at things willy-nilly regardless of my own skills were. |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | **Rahner Dep. 40:6-20** |
| 49. In light of Rahner's substandard performance, his editors had ongoing discussions with each other and with Rahner to establish expectations for him in the GA role. | **Higgins Decl. ¶¶ 9, 10, 14, 15, Ex. A, B, G, H**<br><br>**Dardarian Decl. ¶¶ 12-13** |
| 50. These communications reaffirmed that Rahner was first and foremost a GA reporter (not a pop culture writer) who needed to be available to report daily stories—most of which were assigned from editors. | Q.  So, why don't you tell me what your recollection is of that conversation that you had with Matt Kreamer, Mark Higgins, and Jim Simon about what your role would be on the Metro desk.<br>A.  Essentially that I would be a Metro GA reporter, but that time permitting, I would still be allowed to do the Q and A.<br>**Rahner Dep. 51:25-52:6** |
| 51. In response to Rahner's frustrations and in an attempt to obtain good work product from Rahner, STC permitted Rahner to write stories and produce videos – which he starred in – beyond his GA role when time permitted. | **Higgins Decl.  ¶ 9, Ex. A**<br><br>**Dardarian Decl.  ¶¶ 9-12**<br><br>Q.  Tell me about how in your view it's a different universe.<br>A.  Well, features involved doing interviews, reviews, a lot of critic work, a lot of writing about events that were going on, books, movies, comic books, comedy, you know, pop culture, what we generally understand as pop culture, anything that involved that.  I was kind of a jack-of-all-trades and staff nerd, I guess. In news, however, it was just a matter of covering straight news.  It was fairly straightforward. Although I did, however, continue to do some of the kind of Q-and-A interviews that I had done while I was the pop culture writer.  And in fact, I had -- well, go ahead.<br>Q.  Go on.<br>A.  I had done a number of other things as well, including, you know, trying to try some innovative video work, doing some short satirical videos for The Times website at a time when I hadn't seen any of |

13

DWT 22258718v1 0040701-001034

016

| UNDISPUTED FACT | SOURCE |
|---|---|
| | that from other newspapers.  So, it wasn't a hundred percent straight news, but that was mainly what the job was, and the other things were primarily on my own initiative.<br>Q.  "The other things" meaning the Q-and-A interviews, the video work, and the -- I guess the Q-and-As and the video work?<br>A.  Yes.<br>**Rahner Dep. 38:17-39:16**<br><br>Q.  So, when you started over at the Metro desk, you were starting to tell me about how you tried to incorporate some of that pop culture reporting or your expertise in pop culture into the role; is that correct?<br>A.  Yes.<br>Q.  You described the Q-and-A pieces?<br>A.  Uh-huh, yes.<br>Q.  You also talked about video reporting or videos that you created?<br>A.  Yeah, I made a series of short videos, yes.<br>Q.  Did you ever talk about a pop culture blog?<br>A.  Yes.<br>Q.  Is that something that ever went anywhere?<br>A.  No.<br>Q.  Who did you talk to about the pop culture blog?<br>A.  Mainly Kreamer.<br>Q.  Was there -- was there interest in it from Kreamer?<br>A.  Not really.  I mean, as opposed to him just passing it up the chain, chain of command.<br>Q.  So, other than doing the Q-and-A pieces, the video reporting, you -- the rest of your time was spent doing the general assignment news reporting, correct?<br>A.  Correct, for the most part.<br>**Rahner Dep. 48:15-49:13**<br><br>Q.  And the initiative that you were |

14

| UNDISPUTED FACT | SOURCE |
|---|---|
| | showing was creating the web videos and doing the Q and As, and --<br>A.  And proposing other work that included the pop culture blog, yes.  Those required a great deal of work and you didn't see anybody else doing those.<br>Q.  So, the Q and A and the pop culture blog were things that sort of harkened back to your work on the feature desk as the pop culture writer, correct?<br>A.  Harkened back?<br>Q.  You did the Q and As as a feature writer?<br>A.  Yeah, and I did them in Metro news and they were well received in both places.<br>Q.  You also -- I mean, the pop culture blog would be related to your being the pop culture writer when you were on the feature desk?<br>A.  It would also be related to an area of coverage that I saw we were lacking that I was suited for with my experience and my talents.<br>**Rahner Dep. 284:1-18** |
| 52. However, STC made it clear these were intended to be side projects, not the main focus of his work. | **Higgins Decl. ¶ 9, Ex. A**<br><br>Q.  So, why don't you tell me what your recollection is of that conversation that you had with Matt Kreamer, Mark Higgins, and Jim Simon about what your role would be on the Metro desk.<br>A.  Essentially that I would be a Metro GA reporter, but that time permitting, I would still be allowed to do the Q and A.<br>**Rahner Dep. 51:25-52:6** |
| 53. As early as the fall 2009, STC began to consider and formally address Rahner's lack of performance, which appeared to stem in part from his disinterest in GA reporting. | **Dardarian Decl. ¶¶ 12, 13**<br><br>**Higgins Decl. ¶ 10** |
| 54. In October 2009, Suki Dardarian, the Managing Editor of *the Times*, and Jim Simon, the Deputy Managing Editor, suggested Higgins to start the | **Higgins Decl. ¶ 10; Ex. B**<br><br>**Dardarian Decl. ¶¶ 12-13** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| performance review process with Rahner to document and communicate about role in the Metro department. | |

### D. Rahner Discloses His Chronic Fatigue Syndrome and STC Engages in the Interactive Process to Accommodate Rahner's Purported Disability

| UNDISPUTED FACT | SOURCE |
|---|---|
| 55. In late 2009 and early 2010, Rahner began showing up for work one or two hours late for his shift most days. | Q. During this time period you were coming in to work 10 or 11 o'clock; is that typical?<br>A. At different times every day, but, yeah, typical.<br>**Rahner Dep. 127:1-4**<br><br>Q. During the time after you communicated to Mr. Higgins about your need for flexibility in February and into March, April, May, I think you testified that you were continuing to come in at 10 or 11 o'clock typically; is that correct?<br>A. Roughly.<br>Q. When you would show up at 10 or 11, were you contacting Matt Kreamer or Mark Higgins to let either of them know that you would not be at work by 9 a.m.?<br>A. Oh, no.<br>**Rahner Dep. 148:13-22** |
| 56. He did not notify his supervisors of his tardiness, whereabouts, or status. | *Id.* |
| 57. On February 24, 2010, Higgins emailed Rahner about an assignment and asked him why he was coming in late and not keeping the same schedule as other reporters. | **Sullivan Weiss Decl. Ex. 4** |
| 58. Rahner responded that he had "chronic fatigue" and it "requires flexibility." | *Id.* |
| 59. Higgins almost immediately responded to offer Rahner intermittent FMLA, point him in the direction of accommodation resources, and to request from Rahner a doctor's note to begin the interactive process. | **Higgins Decl. ¶ 11, Ex. C, D** |
| 60. Higgins explained that the doctor's note is required and needs to "explain what is happening | *Id.* |

| UNDISPUTED FACT | SOURCE |
|---|---|
| and what you can and cannot do" in order to determine what accommodations STC can provide. | |
| 61. Approximately two weeks later, Rahner provided STC a note from his naturopath, Dr. Paul Dompe, N.D.It stated: "Mark's condition requires that he get adequate rest, especially during the morning hours. Please allow some flexibility in his schedule to meet his medical needs." | **Sullivan Weiss Decl. Ex. 5** |
| 62. This was the first time Dr. Dompe diagnosed Rahner with chronic fatigue syndrome. | Q.  Tell me about what prompted the session March 4, 2010 to the extent that you remember.<br>A.  He contacted me and scheduled the appointment to report that he wasn't feeling well, meaning he was still fatigued and wasn't sleeping well.  What page are we on now?<br>**Ex. 2 to Sullivan Weiss Decl. (Dompe Dep.) Dompe Dep. 46:8-13**<br><br>Q.  What were your conclusions after this or your assessment after this appointment?<br>A.  I recommended that he continue to exercise and that's where here in the notes I'm seeing now that to continue the psychotherapy, so I guess that answers my question.  That leads me to believe that he was currently in a relationship with a therapist.  This was when he -- yeah, so he was having a hard time in the morning so I wanted to support him in writing a letter of accommodation so that he had a little more flexibility at work.<br>Q.  Do you remember if he described what his hard time in the morning was, what his issue was?<br>A.  I don't remember.<br>Q.  Do you have any recollection as you sit here today what his concern was about the morning?<br>A.  Well, from my perspective, clearly he wasn't sleeping enough and he was having – his challenge was getting to shut off his |

17

DWT 22258718v1 0040701-001034

020

| UNDISPUTED FACT | SOURCE |
|---|---|
| | mind so he could get adequate rest, that the morning would be a particular difficulty for him. So I decided to support him in writing this letter of accommodation to allow him more flexibility so he could continue to do his work but during a time where he felt more energy because his fatigue was extreme in the morning.<br>Q. And his energy was better in the evening?<br>A. It was higher in the evening, yes.<br>Q. Did he ask you to provide a note that he could take to his employer seeking flexibility or accommodation?<br>A. Yes.<br>Q. On page 8 here, it says, "Assessment: Fatigue chronic." Do you see that?<br>A. Yes.<br>Q. So had you diagnosed him with chronic fatigue syndrome at this time?<br>A. This was the time when I started to have enough information to diagnose him as having chronic fatigue.<br>**Dompe Dep. 50:5-51:18** |
| 63. Given the vague and scant information in Dr. Dompe's note, STC asked Rahner to provide additional information from his doctor and again asked him to provide the necessary paperwork for an intermittent FMLA leave in the event he needed to take time off in the morning. | **Sullivan Weiss Decl. Ex. 6 [ST001156, Ex. 8 Rahner Dep.]**<br><br>Higgins Decl. ¶¶ 11, 13, Exs. C, D, F |
| 64. Rahner never filled out the FMLA paperwork for intermittent leave nor provided additional information from his doctor. | Q. So, I believe the answer, then, to the question that I asked is that no, you did not ever apply for intermittent leave; is that correct?<br>A. No, for the reasons I've stated.<br>Q. So, you didn't apply for intermittent leave and the concern that you had was that it wasn't a workable solution long term. Is that a fair assessment?<br>A. It wasn't a workable solution at all and it didn't address the problem.<br>**Rahner Dep. 139:3-11** |

DWT 22258718v1 0040701-001034

021

| UNDISPUTED FACT | SOURCE |
|---|---|
| 65. Rahner ignored STC's repeated request for his FMLA paperwork and accompanying additional information from his doctor). | *Id.*<br><br>**Higgins Decl. ¶ 13, Ex. F** |
| 66. In his deposition, Rahner for the first time stated that the reason he did not seek intermittent FMLA is that he believed it was "foolish" and "designed to simply embarrass me instead of deal with the problem." | Q. So, what was the problem with calling in? Is it just too burdensome or a hassle? I'm not sure I understand why that was an impediment to your using intermittent leave.<br>A. It was foolish. That was the impediment. The impediment was that for a condition that was ongoing that I was suffering long term that I could predict and the doctor could predict was going to be happening a day or a month or longer, and as it has turned out, years from that time, to deal with it on a day-by-day basis made absolutely no rational sense.<br>Q. Okay. I understand that. So, was your concern that this would require you to be calling your manager more often than you wanted to to report that you weren't going to be able to show up to work?<br>A. I'm not sure what you mean.<br>Q. I'm trying to understand why it was such a barrier to you to use the intermittent leave because it required you to call your manager and report whether you were going to be there or not?<br>A. The barrier to me was that it was not a practical solution to the problem and it seemed designed to simply embarrass me instead of deal with the problem.<br>Q. In what regard is intermittent FMLA leave intended to embarrass you, in your view?<br>A. Well, to run through this again -- you asked me a question. I'm going to answer it.<br>Q. I'm trying to understand. Go ahead and answer. Go ahead and answer.<br>A. It was something that wasn't going away. It wasn't going to be different one |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | day than it was the next in terms of the CFS not being present. The only variable about the CFS was that the attacks hit me at different times and I didn't know what their duration was going to be, but I knew it was going to be there from one day to the next and mornings were always particularly difficult. So, to start from scratch every morning and inform them that I might not be in there precisely at 9 o'clock wasn't addressing the problem. And again, as I said, the filling out a 40-hour workweek wasn't the issue. The issue was some flexibility. **Rahner Dep. 139:20-141:10** |
| 67. He claimed that calling his editors on mornings when he would be late for his shift would be "totally unfeasible" and "a problem." | Q. We're going to look at that in a minute. Did you ever apply for intermittent FMLA in response to this or any other communication from The Seattle Times? A. I told Matt Kreamer that for a chronic ongoing condition the intermittent leave was totally unfeasible and we needed to find a more reasonable way to deal with the problem that wasn't reinventing the wheel every single day. Q. What was unfeasible about the intermittent leave in your view? A. The condition was chronic, it was ongoing, it was all the time. So, let me see. "You'll need to fill out what's called an Intermittent Family Medical Leave Form. That will temporarily allow you to be paid for 40 hours a week even if you are not working that many hours." The problem with this was that it would have required me, say, the way they explained it, to call in every morning if I didn't think I was going to make it there by 9 o'clock instead of dealing with the problem in, you know, a longer term basis that actually worked, and the issue was never my not working 40 hours a week. If I got there late, I stayed late. So, this didn't go to solve the problem |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | at all. And I told Kreamer specifically what I just said to you. And presumably he -- I mean, I went through the proper channels, so presumably he communicated that to Higgins.<br>Q. So, I believe the answer, then, to the question that I asked is that no, you did not ever apply for intermittent leave; is that correct?<br>A. No, for the reasons I've stated.<br>**Rahner Dep. 138:1-139:6** |
| 68. For a month, STC was under the impression that Rahner was seeking certification from his health care provider for intermittent FMLA. | **Higgins Decl. ¶ 13** |
| 69. Meanwhile, Rahner continued to show up to work two hours late almost every day. | Q. During this time period you were coming in to work 10 or 11 o'clock; is that typical?<br>A. At different times every day, but, yeah, typical.<br>Q. So, you were provided some flexibility in that you were coming in at 10 or 11 o'clock on a regular basis?<br>A. Well, they weren't providing it for me so much as I was taking it and they were complaining about it and refusing to do anything to fix the situation.<br>**Rahner Dep. 127:1-9**<br><br>Q. During the time after you communicated to Mr. Higgins about your need for flexibility in February and into March, April, May, I think you testified that you were continuing to come in at 10 or 11 o'clock typically, is that correct?<br>A. Roughly.<br>Q. When you would show up at 10 or 11, were you contacting Matt Kreamer or Mark Higgins to let either of them know that you would not be at work by 9 a.m.?<br>A. Oh, no.<br>**Rahner Dep. 148:13-22** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| 70. On April 16, 2010, Higgins met with Rahner. Higgins raised the issue of Rahner's consistently late arrivals. | **Higgins Decl. ¶ 14, Ex. G**<br><br>Q.  So, do you recall having a conversation with Mark Higgins on or about April 16, 2010, along with Matt Kreamer, the three of you sitting down and talking about your schedule and your chronic fatigue?<br>A.  This might have been the one where Higgins lectured me on how he doesn't like mornings either.<br>Q.  So, you do recall a conversation with you and Matt Kreamer about your schedule and your chronic fatigue?<br>A.  I think so.<br>Q.  What do you remember about that conversation other than what you've described to me?<br>A.  That's the part that stands out the most, certainly.<br>Q.  You don't remember anything else about that conversation?<br>A.  Perhaps you can refresh my memory.<br>Q.  Okay.  Do you remember Mark telling you that as a general assignment reporter, they need you at the office at the start of the shift?<br>A.  That sounds like something he would have said.<br>Q.  Do you remember him saying that if you were not going to be able to start at the beginning of the shift at 9 a.m., that you would need to apply for intermittent leave given your condition?<br>A.  Yeah, I think we've already been through that, right?<br>Q.  I'm asking about this particular conversation. Do you remember him talking to you about that?<br>A.  This was probably another one of the times when I told him that wasn't a feasible solution to the problem, so yes.<br>Q.  Do you remember talking to Mark about how you wanted to basically have |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | the same schedule you had when you were in features where you could come and go as your schedule was largely dictated by whatever you needed to do that day? A. I'm sure that was something that we discussed in that, for instance, people in the features department always were on top of their beats, knew what they were required to do, knew what their deadlines were, and so when they physically happened to be within eyesight of a given manager was irrelevant because they all knew what they were supposed to be doing and got it done, and never had a problem. And I certainly never had a problem with that. Never missed a deadline. Never had a problem. Q. Do you remember Mark explaining to you that features is different than the way that the Metro desk works, do you remember him talking to you about that? A. Yeah, I remember his condescension in talking to me about that. Q. What do you remember him saying about how the Metro desk works as compared to your experience on the features desk? A. I don't recall exactly how he said everything, if that's what you're asking, but this was when our conversations began to go around in circles. I was asking for help with some flexibility, and he began to repeat this stuff and the conversation just degenerated with him just repeating this stuff. I understood that he clearly wasn't going to consider any flexibility or any help for me. His answer to everything was, "You need to be here at 9. No flexibility." Q. Although he did tell you that you could take intermittent leave if you needed that flexibility, correct? A. Yeah, we've already been through that. I mean, I've given you the most complete answer I can to the intermittent leave issue. |

DWT 22258718v1 0040701-001034

026

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q.  I'm just trying to understand when you say he said no flexibility, that he was willing to accommodate your intermittent FMLA leave?<br>A.  I don't know how much more clearly I can put it that that was at best a very problematic temporary way to address an ongoing problem that really reeked of harassment to me because I told him that it was an ongoing problem, and to have to start fresh to address it every     single day of something that I was living with chronically was preposterous, and I communicated that to him clearly.<br>Q.  Did you and Mark in that conversation talk about the type of work that you were doing on the Metro desk and whether you could change the type of work you were doing and do something more like the features work   you were doing before you were moved?<br>A.  I don't really specifically recall that right now.  I mean, it's possible that we could have because I was always pitching work.  I mean, that's what you do. You pitch stories, you pitch work, you pitch beats.  It's just part of the life at the newspaper.<br>Q.  Do you remember telling Mark that The Times was trying to put a round peg in a square hole with regard to you and the work that you were doing in Metro?<br>A.  I wouldn't doubt it.<br>Q.  Is that something you would say, a round peg in a square hole?<br>A.  That sounds like something I could say.<br>Q.  But you don't remember anything specific in that conversation?<br>A.  No, but it's consistent.<br>Q.  So, after the April 16th, 2010, conversation you continued to come in at 10 or 11 o'clock; is that correct?<br>A.  I think we've established that. |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | **Rahner Dep. 149:13-153:14** |
| 71. Higgins informed Rahner that, in a GA role, he needed to be in the office each morning at 9 a.m. to receive assignments. | *Id.* |
| 72. Higgins clarified that the schedule independence Rahner enjoyed in Features was not an option in his role in the Metro department. | *Id.* |
| 73. Higgins told Rahner that if he needed to continue coming in one or two hours late every day, he needed to seek intermittent FMLA and provide the requested information from his doctor. | *Id.* |
| 74. Rahner again ignored Higgins' request and continued to consistently report to work two hours late for the next two months. | **Higgins Decl. ¶ 14**<br><br>Q.  So, after the April 16th, 2010, conversation you continued to come in at 10 or 11 o'clock; is that correct?<br>A.  I think we've established that.<br>**Rahner Dep. 153:11-14** |
| 75. Because of the ongoing efforts to sort out Rahner's need for accommodation and leave, Rahner was not subject to disciplinary action for his tardiness despite that it was violation of STC policies. | **Hollenbeck Decl. ¶ 4, Ex. A** |
| **E.      STC Decides to Move Rahner to Evenings** | |
| 76. In June 2010, Higgins and Kraemer completed Rahner's performance evaluation, a process that Higgins started in late 2009 before Rahner notified his managers of his alleged CFS. | **Higgins Decl. ¶ 15, Ex. H**<br><br>**Dardarian Decl. ¶ 17** |
| 77. The evaluation addressed the serious performance concerns centering on Rahner's inability to follow the basic tenants of working in a newsroom environment. | *Id.* |
| 78. Rahner never embraced his role as a GA reporter; he lacked follow-through on stories or opportunities; he was not a proactive, self-directed member of the team; he was not collaborative and did not want to follow the direction of his supervisors as demonstrated by the video project; his writing tone was sometimes off key; and he continued to refuse to notify his | *Id.* |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| supervisors when he would be late. | |
| 79. Around the same time, in late May 2010, the STC was reshuffling positions within the Metro department. | **Higgins Decl. ¶ 16, Ex. I** |
| 80. The job description for the evening GA reporter is the same as the job description for the day GA reporter, but the tasks and flow of the job are different. | **Higgins Decl. ¶ 16, Ex. J [ST000154].** |
| 81. The evening shift had the same pay, the same title and the same number of hours. | Q.   The job -- the shift from the day shift as a general assignment Metro reporter to the evening shift as a general assignment Metro reporter did not change your pay, correct? <br> A.   Correct. <br> Q.   And it didn't change your title as a general assignment reporter, correct? <br> A.   I don't know if it would have been a title change or not. <br> Q.   It didn't change your benefits? <br> A.   No. <br> Q.   Didn't change the full time status of your job? <br> A.   No. <br> **Rahner Dep. 224:1-13** |
| 82. Whereas day GA reporters report from the field, communicate with sources, and run down leads, the evening GA reporter largely works within the newsroom to update the day's top stories as they develop through the night and to monitor various sources for breaking news, including law enforcement announcements, news broadcasts and certain Twitter accounts. | **Higgins Decl. ¶ 16** |
| 83. Some days, there is downtime during which the evening shift reporter can work on enterprise stories or side projects. | **Higgins Decl. ¶ 16** <br><br> Q.   So, you also talked to Matt about the possibility of using the downtime during the night shift to contribute to a pop culture blog? <br> A.   That was actually a carrot that he had dangled in front of me. <br> Q.   Dave Boardman? |

26

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. Matt.<br>Q. What, the pop culture blog?<br>A. Yeah, Matt said one thing to consider is that if I take -- as I say here in the email, if I took the night cop shift, during whatever downtime occurred, maybe one thing to make it more palatable would be to do a pop culture blog. I think he might have even been the first one to mention that and not me.<br>Q. That was something that was of interest to you, doing a pop culture blog during the downtime?<br>A. Whatever downtime existed, yeah, sure.<br>**Rahner Dep. 161:4-20** |
| 84. The evening GA reporter works with at least one editor who is available throughout the night to provide coverage and relief as needed. | **Higgins Decl. ¶ 22**<br><br>Q. So, you would work Monday through Friday from 3 to 11:30; is that right?<br>A. Yes.<br>Q. Was there also an editor on staff at the time?<br>A. Generally there was one editor, but toward the end of the evenings, that's part of the reason the job was so awful, toward the end of the evening, the editor goes home and you are the reporter and the editor.<br>Q. What time does the editor go home?<br>A. Oh, I think it's different times, but sometimes 10ish.<br>Q. So, different times, sometimes 10. Are there other times when the editor goes home?<br>A. Yes, but let's just say in general I think 10.<br>Q. So, in your experience during that two-week period the editor was going home at 10?<br>A. I think so.<br>Q. Who was the editor?<br>A. Kathy McLain. |

DWT 22258718v1 0040701-001034

030

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q.  So, from 10 to 11:30 you say that you were the only one on the desk; is that right?<br>A.  Actually, now that I think of that, I think that was mainly on weekends.  I think that -- I think that the editor during the weekdays might be there until the end.  Yeah, weekends, sorry about that.<br>**Rahner Dep. 62:25-63:24** |
| 85. The evening shift is typically less self-directed. There are rote assignments that come up most or all shifts, and the rest of the work is usually assigned by an editor. | **Higgins Decl. ¶ 16** |
| 86. For both the day and evening shifts, punctuality is an essential function of the job. | **Higgins Decl. ¶ 16, Ex. J**<br><br>**Dardarian Decl.  ¶ 27** |
| 87. The evening GA shift was open because the permanent evening GA reporter, a long-time STC reporter Charles Brown, was taking a long-term medical leave to treat terminal cancer and was not expected to return to work. | **Higgins Decl. ¶ 17** |
| 88. Previously, the paper had covered Brown's shorter-term medical leaves by temporarily rotating other reporters into the evening GA slot. | *Id.* |
| 89. That approach pulled reporters – often highly productive and successful reporters – off their beats for several days or weeks and dropped them into a position where they often had little or no knowledge of the daily routines. | *Id.* |
| 90. Higgins determined that STC needed to fill the evening role on a permanent or semi-permanent basis to minimize the disruption and ensure quality coverage on evenings. | *Id.* |
| 91. Higgins was short on options.  Rahner was an obvious candidate for the job. | **Higgins Decl. ¶ 18, Ex. I** |
| 92. Rahner was not successful in the day GA role. | **Ex. 8 to Sullivan Weiss Decl.**<br><br>**Dardarian Decl. ¶¶ 16-17**<br><br>**Higgins Decl. ¶ 15, 18, Ex. H** |

DWT 22258718v1 0040701-001034

031

| UNDISPUTED FACT | SOURCE |
|---|---|
| 93. Rahner acknowledged the lack of fit and his unhappiness in the role to his editors. | Q.  So, was it a big shift for you then to move to the Metro general assignment desk and not be able to do that same level of pop culture writing?<br>A.  Yes.<br>Q.  Was it difficult?<br>A.  Well, it was difficult in that the managers weren't very good at using the right tool for the job. And so we all, when we're hired as reporters, have skill sets, things that we're good at and have proven, demonstrated expertise at and skill at.  And one of the difficult things about going to Metro news was just sort of being treated like a gofer sometimes.<br>Q.  What do you mean by that?<br>A.  Just thrown at things willy-nilly regardless of what my own skills were.<br>Q.  So, do you feel like your skills were underutilized?<br>A.  To say the least.<br>Q.  Tell me about that.  Tell me a little bit more about what your feeling was about being underutilized.<br>A.  Well, I just -- a good deal of the time I was thrown at things in the way an intern would be with no regard for what my demonstrated and widely praised work was.<br>**Rahner Dep. 40:6-41:4**<br><br>Q.  How did that make you feel when you were saying  -- you say that you were used like a gofer or intern?<br>A.  It was frustrating.<br>Q.  Did that affect your happiness in your job?<br>A.  Of course.<br>**Plaintiff 43:13-17**<br><br>Q.  Do you remember during one of those coffee sessions or more than one of those coffee sessions talking about how you were unhappy at Metro desk? |

29

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. Well, that probably would have come up fairly often because I was always pitching work that was more appropriate to my demonstrated skills and seniority. **Rahner Dep. 79:5-10** Q. I'm asking questions. I'm not suggesting anything. I'm just trying to understand whether you told Kreamer that you were unhappy on the Metro desk? A. I very well may have been, and I may have told him that, but I don't recall specifically a time when we were at coffee when I said, "Matt, I'm unhappy on the Metro desk." **Rahner Dep. 79:20-80:1** |
| 94. Rahner rarely generated his own stories, often declined or ignored opportunities to contribute, and was not as productive as expected. | **Higgins Decl. ¶ 18, Exs. H, I** |
| 95. Based on Rahner's poor track record with self-generated stories, STC wanted to transition him into a role where he would have tasks assigned to him and ready and waiting for him on a daily basis. The evening shift fit this need. | **Higgins Decl. ¶ 18** **Ex 8 to Sullivan Weiss Decl. (Ex. 16 to Rahner Dep., ST 000034)** **Dardarian Decl. ¶¶ 16-17, Ex. 2** |
| 96. Rahner's editors also believed the shift would help accommodate Rahner's CFS because he claimed to have difficulty reporting to work in the mornings, which was not a long term possibility in the GA position. | **Higgins Decl. ¶ 18** **Dardarian Decl. ¶ 16** |
| 97. Rahner himself admits that he suffered "extreme fatigue" in the mornings, and sought to not come in at that time of day. | Q. Do you have any recollection as you sit here today what his concern was about the morning? A. Well, from my perspective, clearly he wasn't sleeping enough and he was having – his challenge was getting to shut off his mind so he could get adequate rest, that the morning would be a particular difficulty for him. So I decided to support him in writing this letter of accommodation to allow him more flexibility so he could continue to do his work but during a time |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | where he felt more energy because his fatigue was extreme in the morning.<br>Q.   And his energy was better in the evening?<br>A.   It was higher in the evening, yes.<br>**Dompe Dep. 50:19-51:6**<br><br>Q.   What was your understanding of what type of flexibility in his schedule he needed in order to meet his medical needs?<br>A.   To free up his morning hours so he didn't have to come into work in the morning.<br>Q.   So he wouldn't have to come into work until like midday?<br>A.   I didn't specifically state that.  I kind of left that up to Mark and his employer to decide.<br>**Dompe Dep. 53:4-12**<br><br>How did chronic fatigue affect you during the time that you were working at The Seattle Times?  Describe for me sort of what was the effect of that syndrome or that condition.<br>A.   It was a very specific feeling.  It was like a lead blanket.  It was like -- it wasn't just like being tired.  It was like how you would imagine kryptonite felt.  It was random.  I didn't know what triggered it.  And I never knew how long it was going to last.  It could be a few minutes, hours.  It could be a whole day.  It was very frustrating.  But the term I used over and over again describing it to everybody, it just feels like a lead blanket.  My eyes would get heavy and sunken, and I couldn't focus, it was hard to concentrate.  And it wouldn't pass on its own without whatever degree of sleep   was needed at the time.  I felt weak, physically weak. During these times I would try to force myself to get exercise and I could easily have fallen asleep in between sets.  I mean, it was just |

DWT 22258718v1 0040701-001034

034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | -- it was debilitating.<br>Q. Okay. How did it affect your energy level in the morning?<br>A. There was no energy level. It was -- it was very difficult.<br>Q. Were there times of day where you were more -- you had more energy typically?<br>A. Well, it seemed like in general afternoons were better, but as I said, the fatigue attacks were unpredictable.<br>Q. But were mornings consistently problematic for you?<br>A. Yeah.<br>Q. Describe for me what was the problem in the morning. Was it, you you wanted to stay in bed or you didn't have the energy to get pulled together to get to work?<br>A. Well, it's as I described to you when I described how it felt. It's immobilizing. It's that exact feeling that I described to you.<br>**Rahner Dep. 121:3-122:15** |
| 98. Rahner reported to his doctor that he is a "night owl," his "best writing is done at night," and his fatigue was not bad and he had more energy in the evenings. | Q. Do you remember what he was referring to with things to get done at night?<br>MR. LINN: Objection.<br>A. I don't remember that.<br>Q. Go ahead.<br>A. He referred to himself as a night owl, again, because he had more energy at night and he couldn't get to sleep until 2, 2 a.m. at the earliest. His best writing is done at night. Night owl since childhood. Mind ruminates before bed. He said his fatigue is worse if he's not exercising, so when he's sedentary, so he was very active. He exercised five days a week. He mentioned here he did kick boxing,<br>some treadmill and some weightlifting.<br>And he's in counseling for a year and that he had some psychological breakthroughs<br>**Dompe Dep. 47:1-16** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q.  So the night owl comment, you don't remember what he was referring to?<br>A.  Other than that he had more energy at night and it was hard to shut off his mind at night.<br>Q.  Was he talking to you, to the extent that<br> you remember, about whether he was actually doing things?<br>A.  Well, here in my notes for March of 2010,<br>I write down that he stated, "My best writing is done at night."  So I was assuming that he's writing something. What he's writing, I don't know.<br>**Dompe Dep. 49:3-14**<br><br>Q.  And his energy was better in the evening?<br>A.  It was higher in the evening, yes.<br>**Dompe Dep. 51:5-6** |
| 99. Moving Rahner to the evening shift met STC's business needs and appeared to meet Mr. Rahner's medical needs. | **Dardarian Decl.  ¶ 16** |
| 100.    In July 2010, Higgins and Kraemer met with Rahner to deliver his performance review and told him that he would be starting the evening shift in September 2010. | **Higgins Decl. ¶¶ 18, 19** |
| 101.    STC told Mark that his stint as the evening GA reporter would last six months at which time they would evaluate how it was working and whether he would continue on nights or move back to days. | **Higgins Decl. ¶ 18**<br><br>Q.    So, you received a performance evaluation in the weeks or months before your vacation that took place in the summer of 2010; is that correct?<br>A.    Yes.<br>Q.    So, how soon before you went on vacation did you receive that performance evaluation?<br>A.    I'd have to have the evaluation sitting in front of me for the exact date, but it was -- you know, it was in the spring of that |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | year.<br>(Exhibit 2 marked.)<br>Q.    The court reporter's handed you what's been marked as Exhibit 2, entitled "Performance Evaluation for Mark Rahner, 2010 Reporter Evaluation."  Do you recall receiving this document?<br>A.    It certainly looks familiar, yes.<br>Q.    Did you review this document in preparation for you deposition?<br> A.    No, I didn't.<br>Q.    So, this is the evaluation that we were talking about that you received before you went on vacation in the summer of 2010 and didn't return to work; is that correct?<br>A.    Yes.<br>Q.    This notes that your supervisor is Matt Kreamer. Do you remember who delivered this evaluation to you?<br>A.    Kreamer did.<br>**Rahner Dep. Dep. 80:6-81:6** |
| **F.    Rahner Refused The Move to the Evening Shift, Took a Five Month Medical Leave, and Abandoned His Job** | |
| 102.    Rahner appeared upset that he was being moved to the evening shift. | **Higgins Decl. ¶ 19** |
| 103.    Unable to acknowledge or recognize his own performance shortcomings, Rahner believed it was a great injustice to waste his talents on the evening shift. | Q.  My question is, in section 4 and then there's an area that says goals for next year and how to accomplish them, is there anything that you took out of this evaluation that you felt like that was constructive feedback that you would try to work on or improve?<br>A.  It wasn't meant to be constructive, and I didn't take it that way.  It was meant to cut me down and falsely assert that I'd been a far worse employee than I'd been.  I didn't take it seriously in the slightest. It was laughable.<br>**Rahner Dep. 84:12-21**<br><br>Q.  So, can I -- let me -- tell me if this is a fair summing up of this.  That, in your |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | view, the evening shift on the Metro desk does not require much journalistic talent or experience; is that correct? <br> A. I don't know that I'd state it that way, but -- journalistic talent and experience might help, but it's certainly not a job that requires the expertise of a senior reporter. <br> Q. Did you feel like the job was below you? <br> A. Well, I don't know that I would agree with your phrasing of that. I didn't think it was an appropriate job for my skills. <br> Q. Did you feel like your talent would be wasted on the evening shift? <br> A. Of course. <br> **Rahner Dep. Dep. 66:1-15** |
| 104. In response to Rahner's resistance to the evening shift, Rahner's editors told him that they would consider his alternative suggestions, but the only alternative he offered was a shift in which he could have complete flexibility to come and go as he pleased. | **Higgins Decl. ¶ 20** |
| 105. Almost immediately after learning of the schedule change, Rahner informed STC that he was going to take a continuous FMLA leave although he made it clear he was not refusing his new assignment. | **Ex. 19 to Sullivan Weiss Decl. (ST00768; Ex. 11 to Rahner Dep.)** |
| 106. STC granted Rahner's FMLA leave as requested by Rahner's naturopath, Dr. Dompe. | **Hollenbeck Decl. ¶ 6** |
| 107. Rahner had worked the evening shift a handful of times over the years, typically a weekend or covering one or two nights. In one instance, he worked a two-week stint to cover an absence. | Q. When did you work the evening shift while you were on the Metro desk as a general assignment reporter? <br> A. Well, like all the other reporters, I had to fill in occasionally on weekends. As I said, more and more as the staff grew smaller. And then when the reporter whose job it was became ill, I once filled in for a two-week stretch. <br> **Rahner Dep. Dep. 60:5-11** <br><br> During the two weeks that you were covering the night shift, did the editor, to |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | your recollection, ever go out to cover a story?<br>A.   I don't think so.<br>**Rahner Dep. Dep. 68:15-18** |
| **1.     Rahner Was Released to Work After Exhausting FMLA, But Refused STC's Accommodation** ||
| 108.     Rahner exhausted his FMLA leave in late October 2010. | **Hollenbeck Decl. ¶ 7** |
| 109.     Dr. Dompe released him to return to work with an accommodation of a "flexible work assignment that will allow Mark the *periodic rest needed to prevent a relapse*." | **Ex. 17 to Sullivan Weiss Decl. (Pg. 24 Dompe Dep. Ex. 2)** (emphasis added). |
| 110.     The note emphasized the need for Mr. Rahner to take rest breaks. | Q.   So on October 26, 2010, you had a session with Mr. Rahner?<br>A.   Correct.<br>Q.   And tell me what you and Mr. Rahner discussed during that session.<br>A.   Do you want me to read my notes?<br>Q.   Well, relying on your notes, tell me --<br>A.   My memory is not that good.<br>Q.   Okay.<br>A.   So I have to read the notes because I don't remember.<br>Q.   That's fine.  The notes are your contemporaneous notes of what Mr. Rahner reported to you, so that's fine, rely on the notes.<br>A.   So he reported that his energy is improved.  No longer did he feel like there was a lead blanket on him, didn't feel totally exhausted or debilitated like he had previously.  He hadn't had to take naps as often.  He reported having trouble getting to sleep most nights, that his mind is active.  In bed<br> 3   by 6 a.m. most nights.  That's actually the morning, better when he watches TV.  He's sleeping about six hours a night.  Typically tired all day but not the same type of fatigue.  And that he was drinking half  the alcohol every night, so down to |

DWT 22258718v1 0040701-001034

039

| UNDISPUTED FACT | SOURCE |
|---|---|
| | three shots a<br> night.<br> Q.   In this session, did you recommend that<br>Mr. Rahner return to work?<br>A.   Yes.<br>Q.   And do you recall whether Mr. Rahner shared with you that his employer was moving him to the evening shift?<br>A.   At this point I did have that awareness, because I wrote him a letter to recommend that he return to work but with limitations.<br>Q.   Is that page 24 of Exhibit-2?<br>A.   Yes.<br>Q.   Let's look at page 24 of Exhibit-2.  So when you are referring to the letter, are you also referring to the night shift reference in there, is that what you're talking about, is your first reference to his being moved to the evening shift at the time?<br>A.   Yes.<br>Q.   Okay, and do you recall whether you learned about his being moved to the evening shift prior to writing this letter?<br>A.   Yes.<br>Q.   When did you learn of his moving to the<br>evening shift in relation to when you wrote this<br>letter?<br>A.   It was during the visit on October 26 that<br>I learned that he was being moved to the evening shift or that he had been moved.<br>Q.   What did you and Mr. Rahner discuss as it<br>related to the evening shift?<br>A.   I recall him being challenged in that position because the job, as he reported, required hypervigilence where that did not allow him to have breaks that would allow him to recover and fulfill the job and not feel depleted doing the job.<br>Q.   When you refer to breaks or his |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | concerns about breaks, are you talking about like rest breaks for him to take the five-minute or ten-minute naps that he takes? A. Yeah, right. Well, my impression was that the job didn't allow him to let go of his vigilance, right, so he had to be listening in on the transmitter to hear the police activity throughout the shift and that didn't allow him to get any break. So I thought he would benefit by having some flexibility and that he had some breaks to allow him to return, to recover and then return to the job. Q. Your concern about his working the night shift was to ensure that he had adequate breaks; is that correct? A. Yes. Q. It didn't have to do with the particular hours he was working? A. Correct. **Dompe Dep. 72:8-75:11** Q. So in your opinion as of this early November time period, rest breaks are the only accommodation that Mr. Rahner needed to address his health concerns? A. Yes. **Dompe Dep. 82:5-9** |
| 111.    The note also stated: "I do not recommend night shift reporting as the demands of such an assignment will likely cause relapse of Mark's condition." | Ex. 17 to Sullivan Weiss Decl. |
| 112.    Dr. Dompe testified that this last statement was based entirely on Rahner's representation to him that the night shift required "hypervigilence" that would not allow Mr. Rahner to take the necessary rest breaks. | A. It was during the visit on October 26 that I learned that he was being moved to the evening shift or that he had been moved. Q. What did you and Mr. Rahner discuss as it related to the evening shift? A. I recall him being challenged in that |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | position because the job, as he reported, required hypervigilence where that did not allow him to have breaks that would allow him to recover and fulfill the job and not feel depleted doing the job. **Dompe Dep. 74:8-17** |
| | Q.  So let's look at page 24.  In the first sentence you refer to work-related stressors.  Are those the same work-related stressors that you referred to earlier? A.  Yes, and it includes what I just described as the night shift, including work that was not allowing him to have adequate breaks. Q.  And that's what Mr. Rahner reported to you? A.  Yes. Q.  Do you remember specifically what he said about whether or not he would be able to take breaks? A.  Yes, he said that he didn't, he didn't have -- he didn't have -- he wasn't allowed to have breaks.  In order to do the job, he had to be constantly vigilant. Q.  Did he tell you he was not allowed to have breaks? A.  Well, that's paraphrasing. Q.  But you were left -- A.  I was under the impression the job, the assignment did not allow him to have breaks. Q.  Okay. A.  That was my impression. **Dompe Dep. 75:12-76:10** |
| | Q.  Then on the second page of this letter, which is page 22 of Exhibit-2, you summarize your understanding of the demands of the, quote, night reporting shift.  Do you see that? A.  Yes. Q.  What did you say that you understood the demands to be? |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. That, "The assignment demands sustained and continuous vigilance and does not allow the flexibility necessary to meet Mark's medical needs, (i.e., rest breaks at the onset of fatigue)." <br> Q. On what did you base your understanding the assignment demands sustained and continuous vigilance and does not allow flexibility? <br> A. On Mr. Rahner's report to me. <br> Q. The report that he gave to you during the October 2010 session? <br> A. Yes. <br> Q. Are those his words, "sustained and continuous vigilance"? <br> A. I may be paraphrasing. That's how I described it. <br> **Dompe Dep. 82:10-83:6** |
| 113. In response to Dr. Dompe's letter, Sandra Hollenbeck, STC's Human Resources Manager, called Rahner on November 3, 2010. | **Hollenbeck Decl. ¶ 8** <br><br> Q. So, the court reporter's handed you what's been marked as Exhibit 16. This is, I presume, a document that you have not seen before, as it is not a document prepared or sent to you, unless you've reviewed it in the litigation. <br> A. No, I haven't seen this. <br> Q. I'll represent to you these are Sandra Hollenbeck's notes of communications with you on November 3rd, 2012. Does this refresh your recollection of a conversation with her on November 3rd? <br> A. Give me a second to get through it. Okay. <br> Q. I recognize it's confusing; there's a date at the top that looks like it's incorrect. Does this conversation sound like this is the conversation that took place between the two of you? <br> A. It looks familiar, except for the "MH" part. <br> Q. "MH"? MR, yeah. <br> A. It looks familiar. |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q. Clearly this document was shorthand notes of a conversation. Is this consistent with the conversation you had with Sandra Hollenbeck shortly after your doctor released you to return to work?<br>A. It looks consistent.<br>Q. So, do you remember telling Sandra Hollenbeck at this time that you did not want to come in at a specific time?<br>A. I don't know if I used those exact words, but I mean that's consistent with what I've been saying, yes.<br>Q. Do you remember telling her that you needed independence?<br>A. I had been saying consistently to her and others that independence would help, yes.<br>Q. Independence would help in what regard – your condition in what regard?<br>A. Help with the flexibility so I could rest as needed and so that I could plan out my work a little better ahead of time.<br>Q. Okay. Then you also said that it was hard for you "to adhere to a schedule that's predictive." Do you remember telling her that?<br>A. Where are you looking at that?<br>Q. Just at the end of the document.<br>A. Oh, yeah, okay, yeah.<br>Q. Was this the first conversation you had with Sandra, this was sort of the initial conversation you had with her?<br>A. Well, it could be. Like I said, I don't recall what was first or what was part of the ongoing conversation, but if this is their first record of it, I have no reason to dispute it.<br>Q. And you also stated in there that you need to take breaks.<br>A. Okay.<br>Q. Do you remember telling her that you needed to take breaks?<br>A. That's consistent with what I would have said. |

DWT 22258718v1 0040701-001034

044

| UNDISPUTED FACT | SOURCE |
|---|---|
| | **Rahner Dep. 176:21-179:1** |
| 114.    Rahner reiterated that mornings were tough and stated that he did not wish to return to the evening shift. | *Id.* |
| 115.    Hollenbeck asked  Rahner if he had any alternatives to propose instead of the evening shift.  Rahner stated he wanted independence of any scheduling; he insisted STC should not specify when he report to work or take breaks and he could not adhere to a predictable schedule. | *Id.*<br><br>**Hollenbeck Decl. ¶  8** |
| 116.    Hollenbeck extended Rahner's leave to a non-FMLA medical leave pending the outcome of the interactive process and additional information from Dr. Dompe. | **Hollenbeck Decl. ¶  10** |
| 117.    Hollenbeck immediately sought clarification from Dr. Dompe. | **Hollenbeck Decl. ¶  11, Ex. B** |
| 118.    Dr. Dompe responded explaining that Rahner needed three 15-minute breaks per 8 hour shift, to be taken as needed. | **Ex. 10 to Sullivan Weiss Decl. [ST01178-80]**<br><br>Q.   This appears to be The Seattle Times letter with your answers typed in; is that correct?<br>A.   That is correct.<br>Q.   The Seattle Times letter is dated November 4, 2010.  Do you remember when you sent your answers  back?<br>A.   I don't.  I do not remember.  It must have been done electronically.<br>Q.   So if the record at the Times indicates that they received this letter back on the 17th of November, do you have any reason to believe that's not an accurate date?<br>A.   No.<br>Q.   In response to The Seattle Times Company -- well, let me stop there.  First, what did you understand to be the purpose of the letter from The Seattle Times Company?<br>A.   They wanted clarification, they wanted specifics about what I recommended.<br>Q.   And they were trying to understand |

42

| UNDISPUTED FACT | SOURCE |
|---|---|
| | what you meant by flexible work assignment, correct?<br>A. Yes.<br>Q. What did you recommend as it related to Mr. Rahner's need for a flexible work assignment that<br>allowed for periodic rest?<br>A. I recommended three breaks during an eight-hour shift that were 15 minutes each in duration.<br>Q. Did you also recommend that Mr. Rahner be able to take breaks on an as-needed basis?<br>A. I recommended that he take the 15-minute breaks as necessary.<br>Q. So when he felt like he needed to break, he should be able to take a break; is that a fair summary?<br>A. Yes.<br>Q. Up to three breaks in an eight-hour shift?<br>A. Correct.<br>Q. So toward the bottom of page 21, The 25 Seattle Times Company asks the question whether there are any alternatives to periodic rest breaks that would achieve the desired outcome for Mr. Rahner, and your response is what?<br>A. No.<br>Q. So in your opinion as of this early November time period, rest breaks are the only accommodation that Mr. Rahner needed to address his health concerns?<br>A. Yes.<br>**Dompe Dep. 80:12-82:9** |
| 119. These breaks comported with Dompe's prior suggestion for "periodic rest needed to prevent a relapse." | **Ex. 17 to Sullivan Weiss Decl. (Pg. 24 Dompe Dep. Ex. 2)** |
| 120. Dr. Dompe also stated there was "[n]o restriction on [Rahner's] work hours," including "the time of day" for Rahner's shift. | **Ex. 10 to Sullivan Weiss Decl. (Dompe Dep. [ST001178-80])** |
| 121. Asked about the basis for the statement in his | *Id.* |

| UNDISPUTED FACT | SOURCE |
|---|---|
| October 27, 2010 letter that the evening shift could lead to Rahner's relapse, Dr. Dompe responded that the evening shift "demands sustained and continuous vigilance and does not allow the flexibility necessary to meet Mark's medical needs (i.e. rest breaks at the onset of fatigue)." | |
| 122.    Dr. Dompe's response to this question was again based entirely on Rahner's report to him. | Q.   Then on the second page of this letter, which is page 22 of Exhibit-2, you summarize your understanding of the demands of the, quote, night reporting shift.  Do you see that?<br>A.   Yes.<br>Q.   What did you say that you understood the<br>demands to be?<br>A.   That, "The assignment demands sustained<br>and continuous vigilance and does not allow the flexibility necessary to meet Mark's medical needs,  (i.e., rest breaks at the onset of fatigue)."<br>Q.   On what did you base your understanding<br>the assignment demands sustained and continuous vigilance and does not allow flexibility?<br>A.   On Mr. Rahner's report to me.<br>Q.   The report that he gave to you during the<br>October 2010 session?<br>A.   Yes.<br>Q.   Are those his words, "sustained and continuous vigilance"?<br>A.   I may be paraphrasing.  That's how I described it.<br>**Dompe Dep. 82:10-83:6** |
| 123.    Based on that information from Dr. Dompe, STC determined that it could provide Rahner the three 15-minute rest breaks to be taken as needed during an eight hour shift. | **Hollenbeck Decl. ¶  12**<br><br>**Dardarian Decl. ¶ 19** |
| 124.    Because Dompe appeared to be operating | **Hollenbeck Decl. ¶  14** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| under a misimpression that STC could not provide three 15-minute breaks during the evening shift (which it could and has been verified by the current evening shift reporter, Alexa Vaughn), and because Dompe placed no restriction on work hours, STC confirmed Rahner's move to the evening shift. | **Ex. 2 to Dardarian Decl. (ST001472)**<br><br>Q.   Based on your experience with the nightshift, would it be feasible for you to leave periodically throughout the evening and take uninterrupted 15-minute breaks or naps if you needed them?<br>A.   Yeah.  I can do that.<br>Q.   Have you done that before?<br>A.   Yeah.<br>Q.   And under what circumstances have you needed to take these breaks?  Just on a regular routine basis?<br>A.   Yeah.  I routinely take a 15 to half-hour, or 30-minute, break.<br>Q.   And is there anybody there to cover you --<br>A.   Yeah.<br>Q.   -- for those breaks?  Who is there to cover for you?<br>A.   My editor.<br>**Ex. 3 to Sullivan Weiss Decl., Alexa Vaughn Dep. 18:4-18** |
| 125.   Dr. Dompe testified that the three 15-minute rest breaks STC provided Rahner during his evening shift was the only accommodation he recommended. | Q.  So in your view, in your medical opinion, if Mr. Rahner was able to take the three rest breaks on an as-needed basis throughout the shift, then there was no other accommodation he needed in order to allow him to maintain his health?<br>A.  I would add to that that what I think would benefit him most is to seek psychotherapy.<br>Q.  But as far as the workplace is concerned?<br>A.  Yeah, that's correct.<br>**Dompe Dep. 97:11-19** |
| 126.   On November 26, 2010, Hollenbeck called Rahner to discuss his return to work on the evening shift in light of Dr. Dompe's answers to the questionnaire. | **Hollenbeck Decl. ¶ 14, Ex. C** |
| 127.   She told Rahner that STC could provide him | *Id.* |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| three 15-minute rest breaks per eight hour shift to be taken as needed. | |
| 128.    Rahner refused this accommodation (and the evening shift) and stated that he wanted an assignment that allowed for full independence and flexibility. | *Id.* |
| 129.    STC continued to engage in the interactive process with Rahner regarding his accommodation requests over the following weeks. | **Ex. 11 to Sullivan Weiss Decl. (ST001239).**<br><br>**Hollenbeck Decl. ¶ 13, 14** |
| 130.    In December 2010, Rahner filed a grievance with his union regarding the decision to move him to the evening shift. | **Ex. 12 to Sullivan Weiss Decl. (ST000136)** |
| 131.    STC engaged in the grievance process to seek additional input from Rahner about his accommodation needs and to hopefully broker a mutually agreeable solution. | **Hollenbeck Decl. ¶ 15**<br><br>**Dardarian Decl. ¶ 20** |
| 132.    During the grievance process, Rahner again reiterated his demand for flexibility during a day shift and  his union representative requested that STC create a new position that started at 11 a.m. | *Id.* |
| 133.    On December 17, 2010, Hollenbeck sent Rahner a letter responding that it would not create an 11 a.m. shift as it was not an effective use of the Metro department's limited resources and informing him he needed to return to work at the evening shift. | **Ex. 7 to Sullivan Weiss Decl. Hollenbeck Decl. ¶ 17**<br><br>**Dardarian Decl. ¶ 20, Ex. 2** |
| 134.    The grievance process failed, and the union did not pursue the matter further. | **Hollenbeck Decl. ¶ 17** |
| 135.    At around the same time, Rahner complained to HR that he believed Higgins subjected him to a hostile work environment and that he assigned him to the evening shift as punishment. | **Hollenbeck Decl. ¶ 13**<br><br>Q.  Did you ever complain to any member of management at The Seattle Times Company that you thought you were being discriminated against on the basis of a disability?<br>A.  Well, that's kind of what we've been talking about all day.  I mean, I didn't ever put it in those exact terms, but I kept on asking for help to accommodate   the |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | disability. And by the way, it was The Times HR people who labeled it as a disability. And I kept on asking for help with this, and the end result was them not only not helping, but going out of their way to put me in a more difficult position with regard to the disability. |
| | Q. How did they put you -- I'm sorry, I don't understand. How did they put you in a more difficult position? Are you speaking of the accommodation process or is there something else you're talking about? |
| | A. I'm saying that as difficult a time as I was having with the sickness, they went out of their way to try to put me in a position that was going to make it more difficult in the night job. |
| | **Rahner Dep. 224:14-225:8** |
| | |
| | Q. All right. Set that aside. The second document, Exhibit 28, appears to be a letter to you from Michelle McKinnon. Do you recognize this document? |
| | A. Give me a moment, please. Yeah, this looks familiar. I mean, you don't want me to take the time to re-read the whole thing right now. |
| | Q. You received this document? |
| | A. I believe so. |
| | Q. What was the context in which you received this document? |
| | A. What was the context? |
| | Q. Well, let me ask a different question if that's not clear. Did you receive this via email? |
| | A. It looks like it. Well, it must have been because -- what's the date on this? You're giving it to me without a date, but if I was on my medical leave at the time, then it must have been via email. |
| | Q. So, you had some correspondence with Michelle McKinnon I'm gathering from this document? |

47

DWT 22258718v1 0040701-001034

050

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. Well, that's her name at the bottom of it, yes.<br>Q. Do you remember talking to Michelle McKinnon?<br>A. I think -- didn't she take over for Sandra Hollenbeck? So, I think it was the two of them in HR, so  yes.<br>Q. Okay. So, did you have a conversation with Michelle McKinnon in which she discussed your request for accommodation and concerns about how that process was being handled?<br>A. Apparently.<br>Q. Take a look at this document and let me know whether there is anything that is an inaccurate depiction of the statements that you made or the complaints that you shared with her. I'm not asking for you to provide your view of her conclusions. I'm just asking if there's anything that's inaccurate as it's been attributed to you.<br>A. Okay, this is going to take --<br>Q. And don't write on it.<br>A. Sorry to take so long.<br>Q. That's all right. Do what you need to do.<br>A. Okay. So, what's the question?<br>MS. SULLIVAN WEISS: Can you read back the question, please.<br>(Reporter read back as requested.)<br>A. I don't believe so.<br>**Rahner Dep.  288:1-289:21** |
| 136.    STC's HR department investigated his complaint and did not find any evidence that Higgins or others managers in the newsroom treated Rahner in a hostile, unfair or discriminatory manner. | **Hollenbeck Decl. ¶ 13**<br><br>**Ex. 11 to Sullivan Weiss Decl.** |
| 137.    Rahner believed that Higgins "hated him" from the time he transferred to Metro in late 2008/early 2009. | You said that Kreamer told you Higgins hated you.<br>A. Constantly.<br>Q. When was the first time Kreamer told you?<br>A. I don't know the first time because it |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | was constant.<br>Q.  So, from the outset of your assignment to the Metro desk did you feel like Higgins hated you?<br>A.  Not too long after that, and it wasn't a matter of feeling. It was a matter of being explicitly told that.  Kreamer would come out of meetings routinely with Higgins and say to me, "Man, I don't know what it is, but Higgins has a real hard on for you" constantly.<br>**Rahner Dep. 93:11-23** |
| **2.  Dr. Dompe Unequivocally States that Rahner Can Return to Work the Evening Shift** | |
| 138.  Following the grievance meeting, STC informed Rahner that he was expected to show up for work on January 3, 2011. | Q.  So, in response to this -- your request for additional time, Jim Simon says you need to return to work on the 3rd of January, so he gives you through the holiday, an additional time to talk to your doctor and talk to the guild, right?<br>A.  Right.  Yeah, okay, right.<br>**Rahner Dep. 202:16-21** |
| 139.  On the same day, Ms. Dardarian emailed the evening shift editors asking them to "Welcome [Rahner] back!," and to ensure that Rahner was provided his accommodations of three rest breaks per shift to be taken as needed. | **Dardarian Decl. ¶ 19, Ex. 3 (ST001472)** |
| 140.  Rahner did not show up for his scheduled shift on January 3, 2011. Instead, he sent an email refusing to work the evening shift and suggesting that his blood work showed he was undergoing a "medical emergency" that would put him at further risk of relapse. | **Hollenbeck Decl. ¶ 18, Ex. D**<br><br>Q.  So, Jim Simon tells you to report for work on January 3rd, and you did not report for work on January 3rd; is that correct?<br>A.  That's correct.<br>Q.  And you didn't report at all that week?<br>A.  No.<br>Q.  So, you didn't report on the 4th, you didn't report on the 5th, the 6th or the 7th?<br>A.  I did not report.<br>**Pl. Dep. 203:25-204:8** |

| UNDISPUTED FACT | SOURCE |
|---|---|
| 141. Based on this new assertion of a medical emergency, STC again engaged in the interactive process and offered yet another medical leave. | **Hollenbeck Decl. ¶ 19, Ex. E** |
| 142. STC followed up with Dr. Dompe on January 5, 2011 about Rahner's new assertions of a medical emergency and to seek clarification that Rahner could work the evening shift with the rest break accommodation in light of Rahner's continued insistence that STC has misinterpreted Dr. Dompe's prior notes. | **Hollenbeck Decl. ¶ 19**<br><br>**Ex. 18 to Sullivan Weiss Decl.** |
| 143. The very next day, Dr. Dompe responded to STC's clarifying questionnaire. | *Id.* |
| 144. In unequivocal terms, he stated that Rahner was not suffering from a medical emergency and that he was able to perform the night shift with the rest break accommodations offered by STC. | *Id.* |
| 145. The following is an excerpt from Dr. Dompe's response:<br>2. …Given that Mr. Rahner is able to take up to 3 15-minute rest breaks as needed during the 8-hour shift and based on my description of the duties of the position, is Mr. Rahner medically able to work the 3:00 to 11:30 p.m. shift?<br><br>[Dr. Dompe's Response] ***Mr. Rahner is able to work the 3-11:30pm shift under the stated accommodations.*** | **Ex. 18 to Sullivan Weiss Decl.**<br><br>Q. So in your view, in your medical opinion, if Mr. Rahner was able to take the three rest breaks on an as-needed basis throughout the shift, then there was no other accommodation he needed in order to allow him to maintain his health?<br>A. I would add to that that what I think would benefit him most is to seek psychotherapy.<br>Q. But as far as the workplace is concerned?<br>A. Yeah, that's correct.<br>Q. The limitations that Mr. Rahner -- let me restart that. As far as the workplace is concerned, the only accommodation you identified is the need for these rest breaks that you've described?<br>A. Yes.<br>Q. And upon representation by The Seattle Times Company that this was a position that would allow him to take these rest breaks, you were comfortable that he would be able to perform the job, provided the rest breaks were available? |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A. Correct.<br>**Dompe Dep. 97:11-98:6**<br><br>Q. So as of January 10, 2011, your belief was that he could perform the duties of the evening shift provided he got the rest breaks he needed?<br>A. Yes, the support that I could provide that I thought would benefit him most.<br>Q. There was no other accommodation that you believed that he needed at this time?<br>A. Yes.<br>Q. Let me make sure that's not going to be confusing on the record. Was there any other accommodation that you believed he needed at this time?<br>A. No.<br>**Dompe Dep. 100:24-101:11** |
| 146. In his deposition, Dr. Dompe emphasized that neither the time of day nor the type of work presented any issues to Rahner's health. | Q. When did you learn of his moving to the evening shift in relation to when you wrote this letter?<br>A. It was during the visit on October 26 that I learned that he was being moved to the evening shift or that he had been moved.<br>Q. What did you and Mr. Rahner discuss as it related to the evening shift?<br>A. I recall him being challenged in that position because the job, as he reported, required hypervigilence where that did not allow him to have breaks that would allow him to recover and fulfill the job and not feel depleted doing the job.<br>Q. When you refer to breaks or his concerns about breaks, are you talking about like rest breaks for him to take the five-minute or ten-minute naps that he takes?<br>A. Yeah, right. Well, my impression was that the job didn't allow him to let go of his vigilance, right, so he had to be listening in on the transmitter to hear the police |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | activity throughout the shift and that didn't allow him to get any break. So I thought he would benefit by having some flexibility and that he had some breaks to allow him to return, to recover and then return to the job.<br>Q. Your concern about his working the night shift was to ensure that he had adequate breaks; is that correct?<br>A. Yes.<br>Q. It didn't have to do with the particular hours he was working?<br>A. Correct.<br>Q. So let's look at page 24. In the first sentence you refer to work-related stressors. Are those the same work-related stressors that you referred to earlier?<br>A. Yes, and it includes what I just described as the night shift, including work that was not allowing him to have adequate breaks.<br>Q. And that's what Mr. Rahner reported to you?<br>A. Yes.<br>Q. Do you remember specifically what he said about whether or not he would be able to take breaks?<br>A. Yes, he said that he didn't, he didn't have -- he didn't have -- he wasn't allowed to have breaks. In order to do the job, he had to be constantly vigilant.<br>Q. Did he tell you he was not allowed to have breaks?<br>A. Well, that's paraphrasing.<br>Q. But you were left --<br>A. I was under the impression the job, the assignment did not allow him to have breaks.<br>Q. Okay.<br>A. That was my impression.<br>Q. Was there any other concern that Mr. Rahner expressed about working that shift other than the vigilance and not having time to take breaks? |

DWT 22258718v1 0040701-001034

055

| UNDISPUTED FACT | SOURCE |
|---|---|
|  | A. That the work was mundane and didn't utilize his skills.<br>Q. So in the letter of October 27, 2010, you state that he can return to work full-time with some accommodation that will help prevent relapse of his condition. Do you see that?<br>A. Yes.<br>Q. And the accommodation that you identify is what -- let me strike that. What is the accommodation that you identify?<br>A. Okay. I recommend a flexible work assignment that will allow Mark the periodic rest needed to prevent relapse.<br>Q. So in your stating that he needed a flexible work assignment, your concern or what you thought Mark needed was the ability to take periodic rest breaks?<br>A. That's correct.<br>Q. Was there anything else that you felt Mark Rahner needed in a flexible work schedule other than taking breaks?<br>A. No.<br>Q. So you go on to say, "I do not recommend night shift reporting as the demands of such an assignment will likely cause relapse of Mark's condition"?<br>A. Correct.<br>Q. What is it that you base that statement on?<br>A. I base it on Mark's description of the job.<br>Q. Which was what?<br>A. Which was that the job demanded his full attention throughout the shift.<br>**Dompe Dep. 74:5-77:23** |
| 147. To the contrary, as long as the job permitted Rahner to take up to three 15-minute breaks per shift, Rahner could perform the night GA reporter position. | Q. And upon representation by The Seattle Times Company that this was a position that would allow him to take these rest breaks, you were comfortable that he would be able to perform the job, provided the rest breaks were available?<br>A. Correct. |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
|  | **Dompe Dep. 98:1-6**<br><br>Q. So in your view, in your medical opinion, if Mr. Rahner was able to take the three rest breaks on an as-needed basis throughout the shift, then there was no other accommodation he needed in order to allow him to maintain his health?<br>A. I would add to that that what I think would benefit him most is to seek psychotherapy.<br>Q. But as far as the workplace is concerned?<br>A. Yeah, that's correct.<br>**Dompe Dep. 97:11-19** |
| **3.**     **Rahner Abandons The Interactive Process and Never Returns to Work** | |
| 148.     On January 7, 2011, STC notified Rahner that he had not shown up for work several days in a row and that further refusal to report would be considered job abandonment. | Q. And Miss Hollenbeck responds that notwithstanding your objections to the document Exhibit 21, that your medical leave is ended and that you're expected to return to work on Monday, January 10th; is that correct?<br>A. Looks like it.<br>Q. And that your employment will be terminated for job abandonment because you haven't showed up?<br>A. Yes.<br>Q. Because you haven't shown up for the last five days after you were told to return to work on January 3rd?<br>A. Right.<br>Q. And you didn't show up for work on January 10th at 3 p.m., correct?<br>A. Correct.<br>Q. At that time when you chose not to come to work on January 10th for the 3 p.m. shift, you were aware that failure to do so would result in termination for job abandonment?<br>A. Yes. |

54

DWT 22258718v1 0040701-001034

057

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Q.   You understood that that meant you would no longer be working at The Seattle Times if you did not show up for your stated shift on January 10th?<br>A.   Yes.<br>**Rahner Dep. 213:6-214:4** |
| 149.      In response, Rahner opined that the night shift would harm his health (contrary to his doctor's assertions) and refused to report for work. | **Ex. 13 to Sullivan Weiss Decl. [Ex. 22 to Rahner Dep.; ST00792-94]** |
| 150.      Despite not attempting the evening shift with the stated accommodations, Rahner nevertheless claimed it would irreparably harm his health. | *Id.* |
| 151.      He demanded "flexibility" and "independence" on a shift other than the evening shift. | Q.   Okay.  And I want to just make sure, I'm sort of summarizing what we -- a lot of what we've talked about, but it's important that I make sure I've got this right.  The accommodations you requested that The Times did not provide in your view was a work schedule during a day shift that allowed you to come and go as needed for your medical condition; is that correct?<br>A.   It was one possibility that I suggested.<br>Q.   Okay.  A shift that allowed you complete independence?<br>A.   Complete?  I don't believe I ever said complete  independence.<br>Q.   Full independence?<br>A.   But independence, certainly.<br>**Rahner Dep. 215:5-18**<br><br>Q.   Thank you.  I appreciate that.<br>All right.  So, let's step back for a second and talk about, I think it might be helpful if we identify what accommodations -- what specific accommodations you requested throughout this time period.  So, from the time that you realized that you were sick, whether before you were diagnosed or not, through the end of your employment at The Seattle Times Company, can you identify for me what accommodations you |

| UNDISPUTED FACT | SOURCE |
| --- | --- |
| | requested from The Seattle Times.<br>A. Sure, we've already been through this to some degree, but I asked for a schedule with flexibility and the possibility of sometimes working at home. I actually didn't specify any specific hours, despite what the managers and apparently the union people tried to assert. Like I never requested specifically an 11 to 7 a.m. shift or anything like that. All I requested was please give me a flexible schedule to accommodate fatigue, because it's unpredictable, I don't know how long each spell will last. I just need the flexibility to deal with it. Happy to put in an eight-hour workday, work until the task is finished, but I just need some flexibility as opposed to none.<br>**Rahner Dep. 132:10-133:5**<br><br>Q. Okay. And he told you that when he said a more flexible schedule that that was flexibility to come and go as needed from work, to show up whenever you were feeling up to it?<br>A. I don't recall his exact words now.<br>Q. Something to that effect?<br>A. Sounds about right.<br>**Rahner Dep. 145:14-20** |
| 152. He demanded to "come and go as needed for [his] medical condition." | ***Id.*** |
| 153. Rahner did not want to call his supervisors when he was going to be late for his shift. | The problem with this was that it would have required me, say, the way they explained it, to call in every morning if I didn't think I was going to make it there by 9 o'clock instead of dealing with the problem in, you know, a longer term basis that actually worked, and the issue was never my not working 40 hours a week.<br>**Rahner Dep. 138:17-22** |
| 154. He did not want to work any set hours. | Q. Thank you. I appreciate that. All right. So, let's step back for a second and talk |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | about, I think it might be helpful if we identify what accommodations -- what specific accommodations you requested throughout this time period.  So, from the time that you realized that you were sick, whether before you were diagnosed or not, through the end of your employment at The Seattle Times Company, can you identify for me what accommodations you requested from The Seattle Times. A.  Sure, we've already been through this to some degree, but I asked for a schedule with flexibility and the possibility of sometimes working at home.  I actually didn't specify any specific hours, despite what the managers and apparently the union people tried to assert. Like I never requested specifically an 11 to 7 a.m. shift or anything like that.  All I requested was please give me  a flexible schedule to accommodate fatigue, because unpredictable, I don't know how long each spell will last. I just need the flexibility to deal with it.  Happy to put  in an eight-hour workday, work until the task is finished, but I just need some flexibility as opposed to none. **Rahner Dep. 132:10-133:5** |
| 155.    Rahner did not show up on January 10, 2011. | Q.   And you didn't show up for work on January 10th at 3 p.m., correct? A.   Correct. Q.   At that time when you chose not to come to work on January 10th for the 3 p.m. shift, you were aware that failure to do so would result in termination for job abandonment? A.   Yes. Q.   You understood that that meant you would no longer be working at The Seattle Times if you did not show up for your stated shift on January 10th? A.   Yes. **Rahner Dep. 213:18-214:4** |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| 156. The following day, STC notified Rahner that he had abandoned his job, resulting in separation from employment. | **Hollenbeck Decl. ¶ 21, Ex. F**<br><br>**Ex 14 to Sullivan Weiss Decl. (Ex. 23 to Rahner Dep. ST000024)** |
| 157. Rahner shut down the interactive process refusing to try the evening GA shift with the stated accommodations of three 15-minute breaks, as needed. | Q. But you never worked the night shift after The Times said that they would commit to giving you three 15-minute breaks to be taken as needed during the eight-hour shift; is that correct?<br>A. That is correct<br>**Rahner Dep. 175:6-10** |
| | |
| **G.      Rahner's Agency Charge and EEOC Investigation** | |
| 158. On February 28, 2011, Rahner filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging disability discrimination and retaliation. | **Ex. 15 to Sullivan Weiss Decl. [EEOC change; Ex. 25 to Rahner Dep.]**<br><br>**Ex. 20 to Sullivan Weiss Decl. [EEOC intake, Ex. 26 to Rahner Dep.]** |
| 159. Following an investigation, the EEOC notified Rahner that it intended to dismiss his charge. In doing so, it observed that "it does not appear that there is evidence to show that discrimination based on violation of the [ADA] happened." | **Ex. 16 to Sullivan Weiss Decl. [EEOC Finding, P00034-35]** |
| 160. The EEOC further explained that Rahner "made it clear that [he] was unhappy working in Metro"; that "late arrivals and lack of enthusiasm and productivity made [him] ineffective in this early day assignment" (*i.e.*, the 9:00am shift); and that STC's decision to move Rahner to the evening shift was based on legitimate, nondiscriminatory business needs. | *Id.* |
| 161. This lawsuit followed. | **Ex. 21 to Sullivan Weiss Decl.**, **[Complaint]** |
| **III. Authority and Argument** | |
| 162. Rahner asserts his claims based on his diagnosis of Chronic Fatigue Syndrome. | **Ex. 21 to Sullivan Weiss Decl.**, **[Complaint]**<br><br>Q. So, is it fair to say, then, that the |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | chronic fatigue was the overarching disability concern that you had?<br>A.  Yes.<br>**Rahner Dep. 21:17-20.** |
| 163.     In his deposition, Rahner testified that this claim is based on STC's decision to move him to the evening shift, which led to his refusal to return to work. | Q.  Mr. Rahner, we've talked about your hostile work environment claim, we've talked about your reasonable accommodation claim.  I want to talk about your wrongful termination for disability discrimination claim.  What is the basis for your wrongful termination claim?<br>MR. LINN:  Objection, calls for a legal conclusion.<br>A.  What do I do if he says that?<br>MR. LINN:  You can continue to answer. I just want my objection stated for the record.<br>THE WITNESS:  Oh, sure.<br>A.  The basis for my wrongful termination claim?  Well, I declined to show up for a job that was guaranteed to worsen my health and they fired me.  They were trying to put me in a position punitively that was going to make me sicker and they relied on a dishonest description of the job to my doctor to get him to sign off on it.  That's the basis of it.<br>**Rahner Dep. Dep. 220:8-23**<br><br>Q.  So, Mr. Rahner, is there anything other than what you've just described that forms the basis of your belief that you were put in that job as a punishment or in  order to force you out of The Times?<br>A.  Well, you have to consider the context of the situation.  That's very relevant.<br>Q.  I'm asking you, is there anything else that you can identify here today that, other than what you've just stated, that you believe that forms the basis of your belief that you were put in that job as a punishment or to force you out of The Seattle Times? |

59

062

| UNDISPUTED FACT | SOURCE |
|---|---|
| | chronic fatigue was the overarching disability concern that you had?<br>A.  Yes.<br>**Rahner Dep. 21:17-20.** |
| 163.     In his deposition, Rahner testified that this claim is based on STC's decision to move him to the evening shift, which led to his refusal to return to work. | Q.  Mr. Rahner, we've talked about your hostile work environment claim, we've talked about your reasonable accommodation claim.  I want to talk about your wrongful termination for disability discrimination claim.  What is the basis for your wrongful termination claim?<br>MR. LINN:  Objection, calls for a legal conclusion.<br>A.  What do I do if he says that?<br>MR. LINN:  You can continue to answer. I just want my objection stated for the record.<br>THE WITNESS:  Oh, sure.<br>A.  The basis for my wrongful termination claim?  Well, I declined to show up for a job that was guaranteed to worsen my health and they fired me.  They were trying to put me in a position punitively that was going to make me sicker and they relied on a dishonest description of the job to my doctor to get him to sign off on it.  That's the basis of it.<br>**Rahner Dep. Dep. 220:8-23**<br><br>Q.  So, Mr. Rahner, is there anything other than what you've just described that forms the basis of your belief that you were put in that job as a punishment or in  order to force you out of The Times?<br>A.  Well, you have to consider the context of the situation.  That's very relevant.<br>Q.  I'm asking you, is there anything else that you can identify here today that, other than what you've just stated, that you believe that forms the basis of your belief that you were put in that job as a punishment or to force you out of The Seattle Times? |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | A.  Yeah, they were trying to jam me into a job that had absolutely nothing to do with my decade plus of demonstrated skills or my seniority, and that they were guaranteed would make me sicker.<br>Q.  Anything else?<br>A.  I think that covers the basics.<br>**Rahner Dep. 222:6-22** |
| 164.     Rahner asserts he was subjected to a hostile work environment because of his "tardiness and for the symptoms of his medical condition." | **Ex. 21 to Sullivan Weiss Decl.**, [Complaint ¶ 48]<br><br>Q.  So, you have a claim in this lawsuit for hostile work environment on the basis of your disability.<br>A.  Quite so.<br>Q.  So, do you claim that you were subjected to hostile work environment at The Seattle Times Company?<br>A.  Very much so.<br>Q.  On the basis of your alleged disability of chronic fatigue syndrome?<br>A.  Yes.<br>Q.  On any other basis?<br>A.  Well, they didn't like me, but let's stick with  the chronic fatigue.<br>**Rahner Dep. 86:9-20.** |
| 165.     Rahner also alleges hostile work environment because (1) he was assigned to the night shift and (2) STC allegedly refused to make a reasonable accommodation. | Q.  What is it that anyone at The Seattle Times Company did or did not do that you believe created a hostile work environment?  I'm asking for specifics.<br>A.  They tried to assign me to a position that was going to worsen my health when they knew it as a punitive measure for disliking me and a blatant attempt to drive me out because they knew that it was unfeasible for me to maintain that job.<br>Q.  Is there anything else that anyone at The Seattle Times Company did or did not do to you that you believe is a hostile work environment?<br>A.  Sure.  Even though I repeatedly described the chronic fatigue to my managers and provided them with medical documentation of it, and I'm talking about Kreamer, Higgins, and |

| UNDISPUTED FACT | SOURCE |
|---|---|
| | Boardman, they all repeatedly just kept telling me that I didn't like mornings. |
| | Q. So, this was Kreamer, Higgins, and Boardman? |
| | A. Yes. I don't mean to leave Suki out. But I just can't recall specifically if she ever said that. |
| | Q. Is there anything else that anyone at The Seattle Times Company did or did not do that you believe created a hostile work environment other than what you just described? |
| | A. Well, they refused to make any reasonable accommodation for my worsening ongoing sickness and finally they made a move to worsen it. |
| | Q. We'll talk about the reasonable accommodation. Because you have different claims here. You have a hostile work environment claim, you have a reasonable accommodation claim, and you also have a disability discrimination claim. |
| | A. So, we're on the hostile work environment. Tell me what else I can answer about that. |
| | Q. I want to understand what it is you believe created a work environment that rose to the level of being a hostile work environment on the basis of your disability. You've described two things. One is the assignment to the evening shift, and the second is -- are the comments about your not liking mornings. Is there anything else? |
| | A. Well, after I communicated numerous times the problems I was having and my need for them to help me out -- I mean, there were months that went by when not only would they not do anything to help, but they would keep on complaining about the situation while not doing anything to help. That didn't sound very clear, but -- |
| | Q. No, I'm not sure I understand what it is you're referring to. |
| | A. After I told them numerous times about the chronic fatigue I was suffering, I -- I tried to come up with solutions to deal with it, and not only would they not consider any solutions to deal with it, every time I, say, would come in later than usual or would have to go and crash in my car because I couldn't keep my |

DWT 22258718v1 0040701-001034

| UNDISPUTED FACT | SOURCE |
|---|---|
| | eyes open or something like that, they would keep on running through the same mill of complaining and not doing anything about it.<br>Q.  Complaining about your not being at work during your scheduled hours?<br>A.  You know, even though very, very few of the reporters in that building keep a very strict schedule, if I didn't -- if I wasn't there right at 9 o'clock, you know, there would be words about that, and I would say, "Listen, we have to do something about this, because it's an ongoing problem," and -- but it was just, you know, the same thing again and again.<br>**Rahner Dep. at 86:21-89:11** |

DWT 22258718v1 0040701-001034

065