The Honorable John C. Coughenour

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARK RAHNER,

        Plaintiff,

v.

THE SEATTLE TIMES COMPANY, a Delaware corporation,

        Defendant.

No. 2:12-cv-00880

DECLARATION OF MARK HIGGINS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Mark Higgins, declare as follows:

1. I make the statements in this declaration based on personal knowledge and my review of the business records of The Seattle Times Company that are kept in the usual course of business. I am competent to testify to the matters stated herein.

2. I joined The Seattle Times Company ("STC") in 1999 as the Eastside Bureau Editor. In 2004, I became the Deputy Metro Editor. I am currently employed by The Seattle Times Company as its Metro Editor, a position I have held since 2007.

3. In my role as the Metro Editor, I am primarily responsible for supervising the metro news desk staff and assistant editors. Currently, I supervise about seven assistant metro

Declaration of Mark Higgins (2:12-cv-00880) — 1
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

085

editors and approximately 25 metro reporters. In years past, my reporting staff has been closer to 40.

4. *The Seattle Times* newsroom has four primary news reporting departments: local news (also known as the "Metro desk"), sports news, features, and business and technology news. *Times* reporters work specific shifts to ensure deadlines are met and that the paper contains adequate, quality news coverage. For the last several years, the Metro desk shifts are: early morning (starting at 7 a.m.), day (9 a.m. to 6 p.m.), and evening shift (3 p.m. to 11:30 p.m.).

5. Individual Metro reporters' functions and duties vary according to their assignments. Some reporters hold beats that are exclusively "enterprise" in nature: they develop coverage of specific topics or themes, such as the environment. Other beats, such as the police beat and the evening general assignment beat, are primarily reactive; reporters cover breaking- and daily-news events. Such reporters often produce multiple versions of stories each day: incremental versions for publication on *The Times*' website and other electronic platforms plus versions for the print edition. It is especially essential that these types of general assignment reporters timely report to work because: (1) reporting on the "news of the day" is time-sensitive and cannot be postponed; and (2) the newsroom relies on general assignment reporters to fill gaps in coverage. Moreover, the evening general assignment reporter works when the newsroom is especially thinly staffed. Day or night, unplanned absences by general-assignment reporters jeopardizes the quality of the news product and often forces other reporters to abandon their own responsibilities to fill in.

Declaration of Mark Higgins (2:12-cv-00880) — 2
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

086

6. Moreover, reliability and predictability are critical to our news-planning process. Editors and managers at various levels meet throughout the day and week to plan and negotiate the content of the paper and the website. Each day, editors must reconcile their story "budget" with the amount of space available in the next day's paper, or the "news hole." Meanwhile, when news breaks or develops, editors must be able to immediately assign that story to a reporter. That is the precise reason it is important we have general assignment reporters who are present in the newsroom and available to jump on assignments as needed. When, without warning, a general assignment reporter simply fails to show up, it undermines our ability to effectively manage our already scant resources – and the product suffers. Arriving one or two hours late without notifying a supervisor is also untenably disruptive. Most GA story assignments take place between 9 a.m. and 11 a.m.; editors need to know at the beginning of that process which reporters they can rely upon to cover the day's news. By routinely showing up substantially late without so much as a phone call to the Metro desk, Rahner managed to dodge the story assignments altogether – thus avoiding his primary duty.

7. This is especially damaging as we struggle to compete with the growing ranks of web-based news sites, including bloggers and news aggregators, many of whom provide free content. Ultimately, our financial success depends, in part, on our ability to provide fast, reliable, accurate news. A news operation must be dynamic, unflappable and flexible. It cannot succeed if hamstrung by key players who are chronically and unpredictably absent.

8. Mark Rahner was a General Assignment ("GA") reporter in the Metro News Department from late 2008 until January 2011. Assistant Metro Editor, Matt Kraemer, was his supervisor, although I was often involved in issues regarding Mark's performance, or lack

Declaration of Mark Higgins (2:12-cv-00880) — 3
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

087

thereof. When STC reduced its Features department in 2008 due to budgetary constraints, Rahner was moved to Metro and spared from the possibility of layoff. As a GA reporter, he was expected to cover breaking news cycle and focus on the "news of the day." The role was deadline driven. I was pleased to have Rahner take on the GA role and I welcomed him to the Metro department. The Metro desk had not hired a new reporter in years, and I hoped he would provide much-needed support in the role, especially given his extensive experience.

9. But Rahner rejected his new role as a GA reporter. Instead of fulfilling his duties, he attempted to continue producing the sort of pop culture stories that he had written while in the Features department. Given our scarce resources to cover the basic demands of a news operation, STC no longer considered the pop culture beat a priority. Therefore, I and other newsroom managers began discussions with Rahner to ensure he understood our expectations of him in his GA role. During the meetings with Rahner, I reaffirmed that his primary responsibility was to perform as a GA reporter (not a pop culture writer). I explained that he needed to be available to report daily stories assigned by editors. Still, when time permitted, I also allowed him to produce side projects outside his official role to help assuage his frustrations and to encourage good product from him. I made clear that these projects were exceptional to his main role. A true and correct copy of an email I sent him explaining his Metro desk role is attached as **Exhibit A.**

10. It soon became clear that we would need to address Rahner's failure to perform his duties and apparent disinterest in his job. In October 2009, Managing Editor Suki Dardarian asked me to begin the process of a conducting a performance review of Rahner. A true and correct copy of that email exchange is attached as **Exhibit B.** At the time, budget cuts

Declaration of Mark Higgins (2:12-cv-00880) — 4
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

088

precluded us from performing annual newsroom-wide performance reviews. Still, we continued to rely on ad-hoc reviews as a coaching tool for poorly performing employees. The review was completed in mid-2010. During that time, Mr. Kraemer and I continued to coach Rahner.

11. In late 2009 and early 2010, Rahner began showing up for work almost every day one or two hours late without notifying the Metro desk of his tardiness, whereabouts, or status. On February 24, 2010, I emailed Rahner about an assignment and asked him why he was coming in late and not keeping the same schedule as other reporters. Rahner responded that he had trouble in the mornings due to "chronic fatigue" and that he "requires flexibility." (This was the first time he told me that he suffered from CFS, despite months of conversations with me and others about his performance. He may have mention feeling tired in the past, but he never indicated that he was suffering from a chronic, ongoing problem.) I offered Rahner intermittent FMLA, referred him to accommodation resources, and directed him provide a doctor's note so we could begin the collaborative process of exploring potential accommodations. A true and correct copy of that email exchange is attached as **Exhibit C**. I further explained to Rahner that a doctor's note was required and needed to "explain what is happening and what you can and cannot do" in order to determine what accommodations STC can provide. A true and correct copy of that email is attached as **Exhibit D**.

12. About two weeks later, Rahner provided STC a note from his naturopath, Dr. Paul Dompe, N.D. It said: "Mark's condition requires that he get adequate rest, especially during the morning hours. Please allow some flexibility in his schedule to meet his medical needs." A true and correct copy of that email is attached as **Exhibit E**. Mark also continued to

Declaration of Mark Higgins (2:12-cv-00880) — 5
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

089

mention to me on a few occasions that he had trouble getting up in the mornings because of his fatigue.

13. Because Dr. Dompe's letter provided only scant and vague information, I asked Rahner to provide additional information from his doctor. I also again asked him to provide the necessary paperwork for an intermittent FMLA leave in the event he needed to take time off during morning hours. For weeks, I and STC human resources staff repeatedly asked Rahner for his FMLA paperwork and additional information from his doctor. A true and correct copy of our requests via email request is attached as **Exhibit F**. For a month, Rahner gave us the impression he was seeking certification from his health care provider for intermittent FMLA. However, Rahner never provided the FMLA paperwork or additional information from his doctor that we repeatedly requested. Meanwhile, he continued to show up to work two hours late almost every day.

14. On April 16, 2010, I met with Rahner to continue the ongoing coaching about our expectations of him as a GA reporter. I discussed his poor attendance and punctuality. I informed Rahner that, in a GA role, it was critical that he be in the office each morning at 9 a.m. to receive assignments. I clarified that the schedule independence Rahner enjoyed in Features was not an option in his Metro position because it was dramatically different role that was driven by breaking news and daily deadlines. I told Rahner that if he needed to continue coming in one or two hours late every day, he needed to seek intermittent FMLA and provide the requested information from his doctor. A true and correct copy of an email documenting this conversation is attached as **Exhibit G**. He never did, again, ignoring my request and continued to consistently report to work two hours late for the next two months.

Declaration of Mark Higgins (2:12-cv-00880) — 6
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

090

15. In June 2010, Matt Kraemer and I finally completed Rahner's performance evaluation, a process we began long before he reported to us that he had CFS. In the evaluation, we highlighted the positive contributions Rahner made to the newspaper, and we raised our serious concerns related to Rahner's inability to follow the basic tenants of working in a newsroom. A true and correct copy of the 2010 Performance Evaluation for Mark Rahner is attached as **Exhibit H**. Specifically, the performance evaluation identified the following performance concerns:

- Rahner never embraced his role as a GA reporter. We asked him for his best story ideas, but he rarely came forward with anything. For example, we asked him to put together a story proposal on how California is handling the medical marijuana issue, but he never followed through.

- He was not a proactive, self-directed member of the team. He didn't volunteer to help and instead sat back waiting for assignments. If the assignment was something that didn't interest him, he didn't show initiative.

- He was not collaborative. Sometimes he showed disrespect for his colleagues and didn't follow the directions of his supervisors.

- He worked on a video project that resulted in about seven videos produced and posted on the website. In doing so, he did not accept guidance from Web and Photo staff. I learned that he ignored their repeated pleas to edit the videos tighter, and to secure permissions for outside clips and photos. The video

Declaration of Mark Higgins (2:12-cv-00880) — 7
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

091

project eventually came to an end because he refused to have editorial oversight over the videos.

- His expense card was taken away because he continually refused to submit receipts as requested.

- His writing tone was sometimes off key. He would take a news story and try to make it humorous in a way that was not appropriate.

- He also refused to notify his supervisors when he would be late and continued to arrive two-hours late despite never having followed through with the STC's requests to provide additional information to explore accommodations.

16. Around the same time, in late May 2010, we needed to make some staffing reassignments in the Metro department, including filling the GA shift that runs from 3 p.m. to 11:30 p.m. I discussed with other editors the idea of moving Rahner to that shift. A true and correct copy of the emails are attached as **Exhibit I.** The other editors, David Boardman, Suki Dardarian, and Jim Simon, agreed that Rahner was an appropriate choice for the job. The general job description of the evening GA position is the same as the dayside spot, but the tasks and workflow are somewhat different. Although some evenings allow downtime for reporters to pursue enterprise stories or side project, generally that shift tends to be less self-directed and driven by editors' assignments. While day-shift GA reporters often visit news scenes, interview sources, and chase down news leads, the evening GA reporter primarily works within the office. The evening reporter updates the day's top stories as they develop through the night and monitors for breaking news (e.g., checks in with police officials, watches the television

Declaration of Mark Higgins (2:12-cv-00880) — 8
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

092

news, monitors certain Twitter accounts, etc.) The evening GA reporter thus ensures our coverage is relevant, timely, and accurate – and that we are not scooped by competitors. As with the day shift, reliable and predictable attendance and punctuality is an essential function of the evening GA post. A true and correct copy of the Job Description is attached as **Exhibit J**.

17. We needed to fill the evening GA beat because the person who held that position, long-time STC reporter Charles Brown, was taking a long-term medical leave to treat terminal cancer. Mr. Brown was not expected to return to work, except sporadically when he felt up to it. He died in August 2010, a month or two after we had made the decision to move Rahner to the evening shift. Previously, when Mr. Brown took short-term medical leaves, we filled his position by temporarily rotating other reporters into that shift. That approach pulled reporters – including highly productive and successful reporters – from their beats for days or weeks at a time and dropped them into a position where they were unfamiliar with the routines and rhythms. It was an acceptable temporary measure while Mr. Brown took short-term leaves, but it was not a sustainable solution for the long run. I determined that STC needed to fill Mr. Brown's position on a permanent or semi-permanent basis to minimize the disruption and ensure quality coverage on evenings.

18. I had few options for filling that spot and Rahner was an obvious candidate: moving Rahner to the evening shift appeared to meet both Rahner's medical needs and our business needs. First, the move met Rahner's medical restrictions and granted his request to be excused from morning work. Rahner's doctor also specifically said that he had difficulty in the mornings. Second, it met our labor needs by filling an important position with one of only a handful of GA reporters not assigned to a particular beat who could easily transition to the

Declaration of Mark Higgins (2:12-cv-00880) — 9
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

093

evening shift. Third, I believed it would foster better performance from Rahner: it was a more structured and directed role. Rahner had not succeeded day-shift GA role. He rarely generated his own stories; he often declined or ignored opportunities to contribute; he was not as productive as needed; and he made it apparent that he was unhappy in the role. I thought he would perform better in a position where particular tasks were be assigned to him and waiting for him on a daily basis, as occurs in the evening shift. I also told Rahner that we would reassess whether the change was working in six months.

19. In July 2010, Kraemer and I met with Rahner to deliver his performance review and told him that he would be starting the evening shift in September 2010. He was not happy about the move. I told him that if he wanted to come up with an alternative proposal, we would consider it.

20. I didn't have much direct communication with Rahner after July 2010. He mostly communicated with HR and other editors. To my knowledge the only suggestion Rahner ever made was to either create a shift for him that started at 11 a.m. or to allow him to come and go as he pleased and without having to report his whereabouts or schedule to his supervisors. Neither of these options was feasible. The 11 a.m. shift had been tried in the newsroom before when we had a larger staff; but it was not an option in the years that followed the substantial downsizing of our newsgathering staff. And, in my view, it was not an option to have Rahner continue in his day shift GA role coming and going as he pleased. That simply does not meet the needs of his role to be a Metro general assignment reporter.

21. Rahner went on leave and ultimately abandoned his job altogether in 2011 rather than even try the evening shift.

Declaration of Mark Higgins (2:12-cv-00880) — 10
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

094

22. While Rahner was on leave, I understand that HR and other STC managers discussed with him and his doctor the nature of the evening shift work. Rahner apparently had said that the evening shift required more vigilance and was more stressful that the day GA shift. I don't agree with his view. The expectations of the evening reporting shift are no greater than the expectations of any other reporting shift. If anything they are lower. While Rahner would have been the only reporter on shift for a portion of the shift, there is almost always an editor available to cover breaks and support work. Much of the work is done by phone or using the web to follow Twitter feeds and other news coverage. The evening shift reporter rarely has to leave the building to go out in the field. If there is a significant breaking news event that happens during the evening shift (for example, the collapse of the I-5 Bridge at Mount Vernon), we call in other reporters.

23. I also understand that during Rahner's leave, he complained to HR that I was treating him unfairly and harassing him due to his illness. Those allegations are completely false and unjustified. My understanding of his complaints about me were that I stated "You just don't like mornings" or something to that effect. I don't recall stating those words to Rahner, but we certainly discussed his inability to report to work in the mornings. I never made any derogatory or insensitive statements about Rahner's CFS or his inability to report to work in the mornings.

24. To my knowledge, Rahner covered the evening shift on one or two occasions when he was working in the Metro department. There was one time when he worked the shift for a couple of weeks, which I believe was in January or February 2010.

Declaration of Mark Higgins (2:12-cv-00880) — 11
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

095

25. It is my understanding that Rahner's doctor stated that he needed to take three 15-minute rest breaks as needed during his eight hour evening shift. We were ready and willing to accommodate Rahner's need for rest breaks. Our plan was to have Cathy McLain, the Metro Editor covering the evening shift, accommodate any breaks that Rahner needed to take. To my knowledge, the current reporter covering the night shift, Alexa Vaughn, regularly takes breaks as needed.

26. We did not hire another Metro reporter for nearly two years after Rahner left.

27. Mark has stated that other reporters have the flexibility to come and go as they want. While that may have been true of his experience working in the Features department, that is not true of Metro reporters. Metro reporters have the flexibility to adjust their schedules to meet the business needs of the paper. For example, if a day shift reporter covers a story that requires him to be in the field early in the morning or late in the evening, he can adjust his schedule that day or the next day. Metro reporters also have the flexibility to attend to occasional child care needs or emergencies, or other personal obligations. When those occasional personal or health issues come up, I expect that reporters will communicate to me or their supervisor about the need to make a schedule change. It is also the case that some reporters have medical issues that require occasional absences or intermittent FMLA leave. They also are expected to communicate about their schedule and comply with the FMLA intermittent leave reporting requirements. However, no Metro reporter – and certainly no GA reporter – is given total discretion to come in whenever they want and to do so without communicating to his or her editor.

Declaration of Mark Higgins (2:12-cv-00880) — 12
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206.622.3150 main · 206.757.7700 fax

096

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed in Seattle, Washington, this __3__ day of July, 2013.

_____
MARK HIGGINS

Declaration of Mark Higgins (2:12-cv-00880) — 13
DWT 22245438v1 0040701-001034

Davis Wright Tremaine LLP
LAW OFFICES
Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045
206 622 3150 main · 206 757 7700 fax

097