Exhibit A

# The Seattle Times

seattletimes.com

**Attendance**

**Issued:** October, 1989

**Last Revised:** January 20, 1999     **Reviewed:** January, 2004

---

The Seattle Times expects regular attendance from all employees. This means being at their work station on time for each scheduled shift, fully able and ready to work.

The Seattle Times allows for a minimum standard of two percent missed days during a rolling twelve-month period (approximately 40 hours per year for full-time employees). However, absences in excess of the two percent standard are subject to discipline. Additionally, failing to report to work without notifying a supervisor may result in discipline regardless of whether or not absences have exceeded two percent.

Attendance records will be kept and monitored for all employees, and an employee's job may be jeopardized by frequent or prolonged absences from work and/or consistent late arrival. Employees are expected to discuss with their supervisor fully and immediately anything that may affect their attendance. If an employee cannot give advance notice, he or she must advise a supervisor directly prior to the start of the shift or as soon as possible.

These guidelines apply to overtime that is scheduled in advance as well as to regular shifts.

Procedures for monitoring absences/tardies may vary from department to department, so all employees should review these guidelines with a supervisor, and familiarize themselves with departmental procedures regarding absences.

Absences approved under the Family Medical Leave Act are not subject to discipline. Please refer to the **Family and Medical Leave Policy** for information regarding eligibility and application procedures.

---

*The Seattle Times reserves the right to change or discontinue this policy at any time. Please refer to the Intranet or Human Resources for the most current information. Specific departments may have additional guidelines and procedures, so check with your supervisor if you have a situation relating to this policy. Members of collective bargaining units should consult their respective agreements for specific terms and conditions of employment and seek clarification if questions arise.*

Exhibit B



# The Seattle Times

## HUMAN RESOURCES GROUP

BENEFITS · COMPENSATION · DIVERSITY · EMPLOYMENT · HR · LABOR RELATIONS · PAYROLL · SAFETY · TRAINING/OD

November 4, 2010

Dear Dr. Dompé:

Thank you for caring for our employee, Mark Rahner. I am writing in response to the letter you wrote on 10/27/10 regarding Mr. Rahner's return to work as a reporter at The Seattle Times. More specifically, I'm seeking your medical expertise in helping to clarify the type of work Mr. Rahner is able to perform so that we can better understand the specific accommodations that are being requested. I would greatly appreciate your input on the following:

In your letter, you indicated that Mr. Rahner's condition has improved with treatment which is good to hear. You recommend that he work a flexible work assignment that allows for periodic rest breaks.

    In your medical opinion, how many rest breaks would be necessary during an 8-hour shift?
    **3 breaks during an 8-hour shift.**

    How long would each break need to be?
    **15 minutes each**

    Could the breaks be scheduled at specific times?
    **Given the unpredictability of Mark's fatigue, I recommend Mark take breaks as needed.**

    How would Mr. Rahner's medical condition be affected if he was occasionally not able to take rest breaks as you describe?
    **Mark may experience a relapse of debilitating fatigue if he is not able to take rest breaks.**

    What about if he was frequently not able to take the rest breaks?
    **Mark may experience a relapse of debilitating fatigue if he is not able to take rest breaks.**

    Are there any alternatives to periodic rest breaks that would achieve the desired outcome?
    **No.**

Also in your letter you indicated that you do not recommend night shift reporting as that type of assignment would likely cause Mr. Rahner to relapse. To be clear, Mark is being assigned to a shift that would work 3:00 p.m. to 11:30 p.m.

EX. 17  Date 5-23-13
Witness Rahner

Michelle E. Diskin 622-6661

141

ST001178

Is this the "night reporting shift" to which you were referring?
Yes.

Rahner. November 4, 2010

You stated that the demands of the assignment would likely cause Mr. Rahner to relapse. What is your understanding of the demands of the assignment?
**The assignment demands sustained and continuous vigilance and does not allow the flexibility necessary to meet Mark's medical needs (i.e. rest breaks at the onset of fatigue).**

What are your specific concerns about this assignment as it relates to Mr. Rahner's condition? Is it about the time of day or the type of work?
**The type of work.**

What are Mr. Rahner's medical restrictions when it comes to the work hours - is it your recommendation that Mr. Rahner only work certain hours of the day, only during daylight, or something else? Please explain.
**No restriction on work hours.**

Does Mr. Rahner have any medical restrictions when it comes to the type of duties he performs? If so, please provide details of his restrictions.
**I do not recommend Mark work on assignments that do not allow the flexibility necessary for rest breaks as needed at the onset of fatigue.**

Lastly, how long do you anticipate Mr. Rahner will require these accommodations?
**Re-evaluate after 6 months.**

The Seattle Times makes every effort to accommodate our employees' restrictions to the degree possible or required by law. I appreciate you taking time to respond to these questions. Please fax this letter directly to my attention at the number below. Feel free to call me if you have questions.

Thank you,

Sandra Hollenbeck
Employee Relations Manager

ST001179

shollenbeck@seattletimes.com
tel: 206/515-5681
fax: 206/515-5560

**Health Care Provider:**

Printed name: _____Paul Dompe, N.D._____ Phone: (206) 816-3433

Signature: _____ Date: _____11/17/10_____

Type of practice: _____Medical_____

Exhibit C

Mark Rahner
Telephone discussion – 11/26/10 @ 1 p.m.
w/Sandra Hollenbeck

SH – Thank you for working with your doctor to provide the answers to the questions I sent. It was helpful and the good news is that there don't appear to be significant restrictions. Three, 15-minute rest breaks is fairly easy for us to work with…

MR – (interrupted) It's difficult to interpret what's really meant. With my condition, it can vary from day to day and it's hard for a doctor to really say what's needed.

SH – Actually, your doctor was fairly concise. He feels that with some flexibility to take rest breaks, 3 breaks each day should prevent you from relapsing according to him. I've already talked to Dave and Suki and they're glad to hear that you'll be able to come back and they feel they can work with your medical needs. They'd like to try it for a while and then assess how it's working for everyone.

MR – I'm perplexed. What about the matter of the arrival time, that's the big issue here.

SH – Now I'm perplexed. The doctor doesn't indicate that there should be any issues with your arrival time.

MR – That's ridiculous! The whole point is that I have to have flexibility. It's foolish to think this can work with out some flexibility on arrival times in the morning.

SH – In the morning? No, the whole discussion was about you being assigned to the 3:00 p.m. shift.

MR – What! Are they still doing that?

SH – Yes, that's what it says in the letter to the doctor. That's why I specifically asked your doctor about your restrictions related to that shift.

MR – I didn't read that in the letter. I don't think that's what the doctor was responding to. I read it completely differently – he intended to say that that shift won't work for me.

SH – (read the excerpt from the letter about the shift time). Again, that's why I sent the letter to begin with – you were saying you didn't think you could work that shift, but your doctor says it's not about the time of day, it's about the need for you to take rest breaks which we can do.

MR – That's problematic. I don't think that'll work. How can I crash 2-3 times during a shift?

SH - Both your doctor and your managers believe this can work so at this point we really need to get you back to work. While we've extended a medical leave to you for this time, there's really not a reason to continue that.

MR – But the doctor said the stress of the job would cause a relapse. When I did it briefly, I was slaughtered. I was a wreck. I think Higgins put me in there just to be punitive.

SH – I'm concerned that your description of what your medical risks are is different than your doctor's. What do you want? This seems like much more about your frustrations with Mark (Higgins) than what you're able to do medically. I know that you've said the start time in the morning assignment was difficult for you and you also obviously have concerns about this assignment too. What assignment would you like?

MR – I would like an assignment that allows for independence and full flexibility. One that utilizes my strengths.

SH – Is there an assignment that exists now like that?

MR – I don't think so. I don't know.

SH – So to be clear, we do want to work with you and make sure you're medically able to do this work. The doctor has indicated that you can. What we can't do is to create a separate job or assignment just based on your medical needs. In other words, we're certainly willing to work with the needs you have, without creating a whole new position for you. Dave and Suki assure me that they can work with you on this.

MR – And you believe them?

SH – Yes, of course. You don't?

MR – Of course not. It's been clear to me that Dave and Mark are just trying to railroad me out of here. I don't think they're dealing in good faith. He and Higgins already denied the things I wrote in my emails before. Do you honestly think they're going to be straight with you?

SH – Yes I do. I certainly don't expect a SVP to lie to me. I'm surprised you want to work here if you feel so confident that your managers are dishonest.

MR – I didn't want to get he Guild involved, but I feel like I need to at this point. This is blatantly punitive and they're just trying to stick it to me. I know the union would like to take this up with them.

SH – That's certainly an option for you. Where do we go from here?

ST001119

MR – I need to read the letter again. I refuse to believe that's what my doctor intended. I may need to talk to him and get this changed.

SH – That's fine, but you'll need to do that quickly because we need to get you back to work. It would also be questionable to me if your doctor changes his medical opinion at this point just so you know.

MR – You've been nice to me up to this point, but I just don't think that my managers are being straight with you. They're trying to force me out be making me move to this shift. This assignment will make me feel worse. I refuse to believe it's the only option. I don't know why they moved me from mornings to begin with.

SH – I think at this point, you should have another conversation with your managers. I'm willing to give you a couple of days to reread the doctor letter and to discuss this with him if you wish. But can you please call me early next week so we can decide where to go from her? We have what we need to get you back to work so this does need to get resolved quickly.

MR – Okay. Thank you.

ST001120

Exhibit D

**From:** Jim Simon
**Sent:** Monday, January 03, 2011 12:58 PM
**To:** Suki Dardarian; David Boardman; Sandra Hollenbeck; Mark Higgins; Martin Hammond
**Subject:** Fwd: Return date contact

Mark is not coming in. Next steps?

Sent from my iPhone

Begin forwarded message:

> **From:** Mark Rahner <markrahner@gmail.com>
> **Date:** January 3, 2011 12:53:55 PM PST
> **To:** Jim Simon <jsimon@seattletimes.com>
> **Subject: Re: Return date contact**
>
> Hey, Jim,
>
> You wanted to know my intention. Here you go:
>
> You and the other managers are insisting I begin the night assignment today at 3 p.m. I can't accept your decision to schedule me for the night shift – contrary to explicit medical advice from my doctor – as a reasonable accommodation for my medical disability.
>
> I've already documented my health issues with you *ad nauseum*. (By "you," I mean you, Higgins, Boardman, Suki and H.R.) Hypoglycemia also plays a role in my chronic fatigue, and stress affects blood sugar. My most recent blood test showed that I was two points above what my doctor called a "medical emergency." Knowing that, your insistence that I roll the dice with my health is even more unconscionable.
>
> You may consider this is an excuse to fire me for insubordination or job abandonment. I don't regard my inability to take the night assignment – because of a well-documented medical condition (one H.R. and The Times acknowledged as a disability) and, in general, refusing to harm myself – as either of those. Nevertheless, please advise me if I'm terminated, so that I can proceed accordingly.
>
> Let's be clear about something, though: From the beginning of this matter, all I asked for was some flexibility in my schedule to accommodate my condition. When I pointed out that many

reporters typically work on informal flex time - because of children, etc. - the managers and H.R. responded as if I'd requested plutonium. But not only is that the (easily provable) case, it's also even *negotiated for in our Guild contract in more than one place*:

SCHEDULING

4.1  The parties recognize that flexibility in the scheduling of employees is necessary and desirable.  Supervisors and applicants are encouraged to adjust the schedules submitted by the applicant, where necessary, to reach the most desirable and productive schedule.

4.2  Upon agreement between the prospective team members and the supervisor, said schedule shall become the participants' regular work schedule.

And, in the Memorandum of Understanding for one method of deviation "Four 10-Hour Work Week:"

SCHEDULING

4.1  The parties recognize that flexibility in the scheduling of employees is necessary and desirable.  Supervisors and applicants areencouraged to adjust the schedules submitted by the applicant, where necessary, to reach the most desirable and productive schedule.

4.2  Upon agreement between the prospective team members and the supervisor, said schedule shall become the participants' regular work schedule.

There's more like that, but you get the idea. It didn't have to come to this at all. The situation went from disrespect and stubbornness on Higgins' part to something much more serious – and blatant – from attempting to deny Higgins' frequent harassing and disparaging remarks (sometimes in front of witnesses) that I simply "don't like mornings" to requesting information from my doctor and "interpreting" it in a way that contradicts nearly all his advice.

2

150

ST000667

You guys should be ashamed of how you've treated me. The other reporters certainly think so, at least. Not so great for newsroom morale, which wasn't sky-high to begin with. But I'll give you one more chance to do the right thing. Let me know *your* intention.

Mark

On Tue, Dec 21, 2010 at 3:39 PM, Jim Simon <jsimon@seattletimes.com> wrote:
Mark --

Our expectation remains that you will return to work for the 3 p.m. shift on Jan.3. Please let us know if that is your intention.

Human Resources informs me that if your first day back is Jan. 3, you won't qualify for benefits until February 1. As such, we are open to having you begin working at the end of December so that you can qualify for January benefits. That would also make you eligible for the January 1 holiday pay. If you're interested in that, please let us know and we will schedule a 3 p.m. shift for one day this month and then ongoing beginning Jan. 3.

Jim

---

**From:** Mark Rahner [mailto:markrahner@gmail.com]
**Sent:** Monday, December 20, 2010 4:36 PM
**To:** Jim Simon
**Cc:** Sandra Hollenbeck; Yoko Kuramoto-Eidsmoe
**Subject:** Return date contact

Jim,

I'm getting in touch to begin discussing a return date, as directed in the memo you were copied on Friday.

Since I only received the memo Friday afternoon, that gives me almost no time to consult with the Guild, etc., about its contents – which are highly problematic. So, I hope you'll allow adequate time for that before we set a return date, even if it's without pay.

The assertions in the memo directly contradict my doctor's recommendations – which were given in exhaustive detail and were made even more explicit with a follow-up note from him that I provided. His directives are not open to "interpretation"; they're unmistakably clear. The "interpretation" in the memo would be patently false to any third party who read the material – and frankly kind of shocking in its blatantness.

151

ST000668

The description of the deadline and assigning limitations is transparently bogus, as well. It wouldn't hold up to the scrutiny of anyone with so much as a passing knowledge of the newsroom. Editors assign stories all day. As I've repeated numerous times, I never asked that a new position be created for me, and there's no need for one. I only asked for the same kind of flex time that many reporters routinely and informally use.

Because of this, the matter needs to arbitrated, and I'm following up with the Guild. That's probably best for your side as well, since insisting I take an assignment that my doctor explicitly warned will worsen my health could put you at significant risk.

Best,

Mark

Exhibit E

---------- Forwarded message ----------
From: **Sandra Hollenbeck** <shollenbeck@seattletimes.com>
Date: Wed, Jan 5, 2011 at 9:49 AM
Subject: Follow up to your email
To: Mark Rahner <markrahner@gmail.com>
Cc: Jim Simon <jsimon@seattletimes.com>, Mark Higgins <mhiggins@seattletimes.com>

Mark,

Jim forwarded the email you sent to him earlier this week. Thank you for letting us know your intentions.

First, I'm concerned about your current medical health. I'm sorry to hear that the recent tests have created a situation your medical provider describes as a medical emergency. Does that mean that you are unable to work at this time? While we've already extended your medical leave beyond when it was medically necessary, we're open to a new leave if medically necessary.

Beyond this latest development, there is the broader issue of your shift assignment. This situation boils down to our interpretation of what your medical provider has been saying and yours. It's important that we clarify that in order to move forward and the only way to do that is to seek input from Dr. Dompe again.

Please see the attached letter I am faxing to Dr. Dompe. He may or may not respond without your authorization so I'd appreciate it if you would contact him to ensure a prompt response. You'll also notice that I'm asking about your current medical status so that if you do need more leave, we can address that right away without having to ask for a whole new certification.

<<Rahner follow up HCP letter.doc>>
I want to reiterate that our goal has always been to get you back to work in a job that you can do and job that needs to be done. In fact, we have already agreed to the accommodation request - specifically the flexibility outlined as medically necessary. That flexibility meets the intent of the contract language you cite. However, unless your medical provider provides new information that changes the described restrictions, our expectation will be for you to return to work and failure to do so will result in your termination.

As we've stated before, we remain open to any proposals you may have beyond what we've discussed that might be mutually agreeable. We're looking forward to hearing back from your medical provider so that we can resolve this situation soon.

Thank you,

154

CONFIDENTIAL

ST000030

Exhibit F



January 11, 2011

Mark Rahner
7226 3rd Ave. NW
Seattle, WA 98117

Dear Mark,

This letter is to inform you that your employment with The Seattle Times is terminated effective today.

You have been on a medical-related leave since August 11, 2010. In spite of being offered your former position and agreeing to your accommodation request, you indicated last week that you would not be returning, but did not formally resign. You were scheduled to work yesterday and today, but did not come to work. Therefore, we are considering your job abandoned, and therefore your employment terminated.

I wish you well in you future endeavors.

Sincerely,


Mark Higgins


Cc: Human Resources, Jim Simon, Suki Dardarian, David Boardman

ST001295